

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
OCT 2 7 2016
Madsen C.J.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 AM on Oct 27, 2016

Susan L. Carl
**SUSAN L. CARLSON**
**SUPREME COURT CLERK**

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 92593-3 |
| Respondent, | ) | |
| v. | ) | En Banc |
| TREY M., | ) | |
| Appellant. | ) | Filed OCT 2 7 2016 |

MADSEN, C.J.—Juvenile defendant Trey M. seeks reversal of his three convictions for felony harassment under RCW 9A.46.020 (discussed below). The primary issue, as certified from Court of Appeals, Division Three, to this court, is whether the Supreme Court's decision in *Elonis v. United States*, ___ U.S. ___, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015), has any impact on this court's objective test (i.e., reasonable person standard) for what constitutes a "true threat" under the First Amendment to the United States Constitution. We hold that because *Elonis* expressly avoids any First Amendment analysis, it provides no basis for this court to abandon its established First Amendment precedent.[1] We affirm.

---

[1] Other issues include whether Trey's statements to his therapist and police amount to a true threat and whether sufficient evidence supports his convictions.

## FACTS

Trey was a high school student at Naches Valley High School at the time of the incident that led to his arrest. At that time, Trey was in counseling with Mark Heeringa, addressing issues stemming from Trey's early childhood history of abuse and neglect. Trey had been in counseling since he was five years old, and had received regularly scheduled counseling from Heeringa for the past two years. During a counseling session on October 7, 2014, Trey was upset because three boys had teased him at school. Trey told Heeringa that he thought about taking a gun to school and shooting the boys. He also said he wanted to kill them and for them to know the pain that he felt. He described a specific plan to shoot the three boys and then himself. First, he would get a gun from his grandfather's gun safe and shoot one boy at the boy's house before school. He would then go to the school and shoot the other two boys and end by shooting himself. He told his counselor that if he couldn't get access to firearms, he would use bombs against the boys.

Heeringa noticed a change in Trey's mood and demeanor as he made these statements. Specifically, Heeringa testified that Trey was angry, gesturing, short in his speech, and raising his voice at the time. Heeringa asked Trey, "'[D]oesn't this seem wrong?'" 1 Report of Proceedings (RP) (Dec. 8, 2014) at 20. Trey replied, "'Who can say?'" Id. Heeringa took the threats seriously and contacted law enforcement.

At trial, Heeringa testified that this was not the first time Trey had threatened to kill someone, explaining that Trey had previously talked about killing others, including

Trey's grandfather. Trey had also previously talked about committing suicide and had described various ways he would kill himself.

Deputy William Boyer of the Yakima County Sheriff's Office met with Trey and asked him to explain what he said and what he would do. Deputy Boyer described his conversation with Trey as follows:

> He told me that he had talked to his counselor and told his counselor that he had thought about and was thinking about killing other students at the Naches [high] school. And so I asked him how he would go about doing that. He indicated to me that he would either find the key to the gun cabinet or he would use an ax and break the door open to the gun cabinet. It's not a gun cabinet, but it's a closet where the guns are kept locked up.
>
> He would then take the 9 millimeter pistol of his grandpa's, and he would go to his friend's house who lives in the near area and kill him first. He would then ride the bus into . . . Naches [high school] like normal. He would then wait at school until the other students were at lunch or everyone was in the cafeteria because that's when the -- there would be the gathering of the individuals he wanted to shoot, at which point he said that he would shoot them and then he would shoot himself.

*Id.* at 54. Deputy Boyer testified that Trey said all of this methodically and without emotion. Trey explained to the deputy that he would use a 9 mm pistol because he could conceal it. Trey also confessed to making 15 or 16 small bombs.

Another sheriff's officer, Detective Sergeant Mike Russell, contacted the principal of Naches Valley High School, Richard Rouleau. Principal Rouleau confirmed a report that Trey was being harassed or bullied at school. Trey had also recently been suspended from school and was upset over the suspension.

3

The State charged Trey with three counts of felony harassment[2] in violation of RCW 9A.46.020(1)(a)(i), (b), (2)(b). Victim E.D. testified at trial, stating that when he learned of Trey's "hit list," he was really scared at first. RP at 87, 91. He testified that he was scared that his life could have been taken. He felt relieved after he learned that Trey was in custody. At the time of trial, he testified that he was still a little scared but "relieved that [Trey]'s in custody." *Id.* at 90.

Another victim, W.B., testified that after learning he was on Trey's "hit list," he was scared and really shaking. *Id.* at 97, 105-07. He told his dad he "was threatened" and that he was scared. *Id.* at 106. At trial, he testified that he was still a little scared. He also testified that he knew Trey had talked about harming himself before and had even made a noose at one point.

The third victim, G.C., testified that he got a text from his friend, W.B., telling him about the "hit list." *Id.* at 118, 120. G.C. said that he was "scared" and "freaked out" at first. *Id.* at 120. G.C. was at home sick at the time. G.C. thought that if he had been at school, the plan might have been carried through. He testified that made him scared and frightened.

Trey was convicted of three counts of felony harassment and appealed these convictions.

Trey filed an opening brief in Division Three, seeking reversal of his convictions and dismissal of all charges and arguing that (1) the State presented insufficient evidence

---

[2] Trey was also charged with one count of threats to bomb property, for which he was found not guilty.

4

to prove felony harassment under RCW 9A.46.020 and (2) his convictions violated the First Amendment because they were not true threats under either the reasonable speaker standard articulated in *State v. Kilburn*, 151 Wn.2d 36, 84 P.3d 1215 (2004), or the subjective intent standard addressed in *Virginia v. Black*, 538 U.S. 343, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003). The State responded, contending that the evidence was sufficient, that Washington's objective true threat test was met, and that *Black* is distinguishable.

In the meantime, the Supreme Court issued its decision in *Elonis*, interpreting the federal crime of transmitting in interstate commerce "'any communication containing any threat . . . to injure the person of another.'" 135 S. Ct. at 2008 (quoting 18 U.S.C. § 875(c)). The Court reversed defendant's convictions, holding that conviction under the federal statute would require a showing that defendant *intended* to issue threats or *knew* that his communications would be viewed as threats. *Id.* at 2012.

Trey filed a reply brief adding citation to *Elonis*, contending that case is "persuasive authority" for the proposition that Trey's convictions are invalid. Reply Br. of Appellant at 20. Amicus American Civil Liberties Union of Washington (ACLU) also filed a brief, asserting that Washington's objective reasonable speaker test is inconsistent with *Elonis*.

The Division Three chief judge issued an order of certification transferring the case to this court to determine the issue of "whether . . . *Elonis v. United States*, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015), requires Washington to change its construction of the

5

harassment statute from an objective person standard to a subjective intent standard." Order of Certification, *State v. Trey M.*, No. 32981-0-III (Wash. Ct. App. Dec. 7, 2015). This court's commissioner issued a ruling that accepted certification, transferred the case to this court for determination on the merits, and directed the parties to file "a supplemental brief addressing the issue identified in the order of certification regarding the impact, if any, of *Elonis v. United States*, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015), on this court's precedent adopting an objective test for what constitutes a 'true threat' that is not protected speech." Ruling Accepting Certification, *State v. Trey M.*, No. 92593-3 (Wash. Dec. 16, 2015). The parties and amicus ACLU filed supplemental briefs. We now address the certified question and Trey's challenges to his convictions.

## ANALYSIS

(1) We decline to abandon this court's precedent applying an objective test for what constitutes a true threat under the First Amendment[3]

Appellant was convicted on three counts of felony harassment (threat to kill) under RCW 9A.46.020(1)(a)(i) and (b).[4] Because the certified question—which concerns

---

[3] The parties were directed to submit supplemental briefing on the impact of *Elonis* on this court's First Amendment true threat precedent. While appellant's and amicus's supplemental briefs do address *Elonis*, they primarily argue that this court should adopt a subjective test based on *Black*.

[4] The harassment statute provides in relevant part:

> A person is guilty of harassment if . . . [w]ithout lawful authority, the person knowingly threatens . . . [t]o cause bodily injury immediately or in the future to the person threatened or to any other person; . . . [and] [t]he person by words or conduct places the person threatened in reasonable fear that the threat will be carried out.

RCW 9A.46.020(1)(a)(i), (b). Conviction for harassment "under subsection (1)(a)(i) of this section by threatening to kill the person threatened or any other person" is a class C felony. RCW 9A.46.020(2)(b)(ii).

appropriate standards for true threats under the First Amendment—will affect how the harassment statute is applied, we address that issue first.

Appellant and amicus ACLU ask this court to overrule *State v. Williams,* 144 Wn.2d 197, 207-08, 26 P.3d 890 (2001), which adopted our state's objective (reasonable person) test for what constitutes a true threat, and hold instead that Washington's true threat test requires subjective intent to threaten. Amicus contends that by doing so, this court would make our state law "consistent with" *Black* and *Elonis.* Br. of Amicus Curiae ACLU at 1. Appellant echoes these contentions, asserting that *Black* is "binding authority" that "compels a subjective-intent standard" concerning any First Amendment true threat inquiry. Appellants's Suppl. Br. on Certified Issue at 13. For the reasons discussed below, we find that neither case so requires and decline to abandon our settled precedent. This court "will not abandon precedent unless it is determined to be incorrect and harmful." *Rose v. Anderson Hay & Grain Co.,* 184 Wn.2d 268, 282, 358 P.3d 1139 (2015); *see also In re Rights of Waters of Stranger Creek,* 77 Wn.2d 649, 653, 466 P.2d 508 (1970) ("The doctrine [of stare decisis] requires a clear showing that an established rule is incorrect and harmful before it is abandoned.").

## *Williams* and Its Progeny

In *Williams,* this court also addressed a challenge to a conviction under Washington's harassment statute. We acknowledged that RCW 9A.46.020 "criminalizes a form of pure speech: threats," and that "'a statute[,] . . . which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in

7

mind.'" *Williams*, 144 Wn.2d at 206-07 (alterations in original) (quoting *Watts v. United States*, 394 U.S. 705, 707, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969)). Noting that the Supreme Court had permitted restrictions on the content of speech in a few limited areas, such as "'fighting words'" and "true threats," and observing that "true threats must be distinguished from threats that constitute protected speech," this court adopted the following definition:

> "A 'true threat' is a statement made 'in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of [another individual]. '" *State v. Knowles*, 91 Wn. App. 367, 373, 957 P.2d 797 (1998) (alteration[s] in original) (quoting *United States v. Khorrami*, 895 F.2d 1186, 1192 (7th Cir.1990)).

*Id.* at 207-08 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S. Ct. 766, 86 L. Ed. 1041 (1942)). This court has consistently relied on the objective (reasonable person) test since its adoption in *Williams*. *See, e.g., State v. J.M.*, 144 Wn.2d 472, 477-78, 28 P.3d 720 (2001) (quoting the *Williams* test); *Kilburn*, 151 Wn.2d at 43 (same); *State v. Johnston*, 156 Wn.2d 355, 361, 127 P.3d 707 (2006) (same); *State v. Schaler*, 169 Wn.2d 274, 283, 236 P.3d 858 (2010) (same); *State v. Allen*, 176 Wn.2d 611, 626, 294 P.3d 679 (2013) (plurality opinion) (same); *State v. France*, 180 Wn.2d 809, 818, 329 P.3d 864 (2014) (same).

Notably, in *Kilburn* this court rejected the same request that appellant and amicus make here—to abandon *Williams* in favor of a subjective intent test. The *Kilburn* decision reiterated the *Williams* test and further explained that "[a] true threat is a serious

threat, not one said in jest, idle talk, or political argument" and "whether a true threat has been made is determined under an objective standard that focuses on the speaker." *Kilburn*, 151 Wn.2d at 43-44. Further, "[w]hether a statement is a true threat or a joke is determined in light of the entire context, and the relevant question is whether a reasonable person in the defendant's place would foresee that in context the listener would interpret the statement as a serious threat or a joke." *Id.* at 46. The *Kilburn* court held that "the First Amendment does not require that the speaker actually intend to carry out the threat in order for a communication to constitute a true threat, and that the State need not prove such intent." *Id.* at 48. *Kilburn* further explained,

> [T]he harassment statute itself does require a mental element. The statute requires that the defendant "knowingly threatens. . . ." RCW 9A.46.020(1)(a)(i). This means that "the defendant must subjectively know that he or she is communicating a threat, and must know that the communication he or she imparts directly or indirectly is a threat to cause bodily injury to the person threatened or to another person." *J.M.*, 144 Wn.2d at 481. Thus, one who writes a threat in a personal diary or mutters a threat unaware that it might be heard does not knowingly threaten. *Id.* The statute does not require that the State prove that the speaker intended to actually carry out the threat.

*Id.* (alteration in original).

### *United States v. Elonis*

Appellant argues that in compliance with the Supreme Court's recent decision in *Elonis*, this court should set aside his harassment conviction under RCW 9A.46.020. We disagree. In *Elonis*, the Court addressed the mens rea required for violating 18 U.S.C. § 875(c) (interstate communication containing threat to injure). We find the Supreme

9

Court's decision in *Elonis* is inapplicable to appellant's conviction under the Washington harassment statute.

In *Elonis*, the defendant created and posted on Facebook his own purported rap lyrics addressing killing his ex-wife and harming others, while asserting that such comments were "'therapeutic.'" *Elonis*, 135 S. Ct. at 2004-07 (quoting *United States v. Elonis*, 730 F.3d 321, 329 (3d Cir. 2013), *rev'd*, 135 S. Ct. 2001). The Court articulated the issue as "whether [18 U.S.C. § 875(c)] requires that the defendant be aware of the threatening nature of the communication, and—if not—whether the First Amendment requires such a showing." *Id.* at 2004. The federal statute at issue contained no mens rea element. *Id.* at 2008. Relying on the construction that "'wrongdoing must be conscious to be criminal,'" *id.* at 2009 (quoting *Morissette v. United States*, 342 U.S. 246, 252, 72 S. Ct. 240, 96 L. Ed. 288 (1942)), the Court held that defendant's conviction was improperly premised (as instructed) "solely on how his posts would be understood by a reasonable person." *Id.* at 2011. The Court reversed defendant's convictions, holding that conviction under the federal statute would require a showing that defendant *intended* to issue threats or *knew* that his communications would be viewed as threats. *Id.* at 2012. The Court expressly did not reach any First Amendment issues. *Id.*

As an initial matter, *Elonis* is a case of *statutory construction*, and, as such, it is limited to the federal statute that it addressed, 18 U.S.C. § 875(c); *see, e.g., United States v. Kirsch*, 151 F. Supp. 3d 311, 317 (2015) ("No case reported thus far extends *Elonis*'s holding beyond [18 U.S.C.] § 875(c)."). As the Fourth Circuit Court of Appeals has

explained, "[I]mportantly, the Court's holding in *Elonis* was purely statutory; and, having resolved the [case] on statutory grounds, the Court declined to address whether a similar subjective intent to threaten is a necessary component of a 'true threat' for purposes of the First Amendment." *United States v. White*, 810 F.3d 212, 220 (4th Cir. 2016), *cert. denied*, 136 S. Ct. 1833 (2016);[5] *see also Elonis*, 135 S. Ct. at 2012 ("Given our disposition, it is not necessary to consider any First Amendment issues.").

Further, in *Elonis*, the federal criminal statute that the Supreme Court was faced with, 18 U.S.C. § 875(c), criminalized communicating a threat through interstate commerce but was silent on the mens rea required to commit the offense.[6] The Court stated that when a federal statute is silent on the scienter needed to commit the offense,

---

[5] The Fourth Circuit held that "*Elonis* does not affect our constitutional rule that a 'true threat' is one that a reasonable recipient familiar with the context would interpret as a serious expression of an intent to do harm." *White*, 810 F.3d at 220. The Fourth Circuit explained the effect of *Elonis* on application of 18 U.S.C. § 875(c) noting that after *Elonis* a conviction pursuant to 18 U.S.C. § 875(c) now requires both a subjectively intended threat and an objectively real threat:

> That is [conviction under 18 U.S.C. § 875(c) requires]: (1) that the defendant knowingly transmitted a communication in interstate or foreign commerce; (2) that the defendant *subjectively intended the communication as a threat*; and (3) that the content of the communication contained a "true threat" to kidnap or injure. To prove the second element, the Government, consistent with *Elonis*, must establish that the defendant transmitted the communication "for the purpose of issuing a threat, or *with knowledge that the communication will be viewed as a threat*[.]" . . . *See Elonis*, 135 S. Ct. at 2012-13. And to establish the third element . . . the prosecution must show that an ordinary, reasonable recipient who is familiar with the context in which the statement is made would interpret it as a serious expression of an intent to do harm.

*Id.* at 220-21 (emphasis added). Similarly, the Washington harassment statute (without any additions) requires both subjective and objective mental elements: the speaker must "knowingly threaten[]," and the fear of the person threatened must be objectively "reasonable." RCW 9A.46.020(1)(a)(i), (b).

[6] 18 U.S.C. § 875(c) provides, "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."

and a scienter requirement is needed to separate wrongful from innocent conduct, the mens rea required to commit the offense must be greater than simple negligence. *Elonis,* 135 S. Ct. at 2010. "When interpreting federal criminal statutes that are silent on the required mental state, we read into the statute 'only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct.'" *Id.* (internal quotation marks omitted) (quoting *Carter v. United States,* 530 U.S. 255, 269, 120 S. Ct. 2159, 147 L. Ed. 2d 203 (2000)).

Importantly, *Elonis* did not mandate a scienter requirement for all offenses. Rather, *Elonis* creates a gap-filling rule that stands for the "'presumption'" of a scienter requirement when the federal offense is otherwise silent. *Id.* at 2010-11 (quoting *Carter v. United States,* 530 U.S. 255, 269, 120 S. Ct. 2159, 147 L. Ed. 2d 203 (2000)). Here, the Washington harassment statute is not silent as to mental states; it requires a specific mens rea, providing in relevant part:

> A person is guilty of harassment if . . . [w]ithout lawful authority, the person *knowingly threatens* . . . [t]o cause bodily injury immediately or in the future to the person threatened or to any other person; . . . [and] [t]he person by words or conduct places the person threatened *in reasonable fear* that the threat will be carried out.

RCW 9A.46.020(1)(a)(i), (b) (emphasis added). As can be seen, the above quoted language requires both subjective and objective mental elements: the speaker must "knowingly threaten" and the fear of the person threatened must be objectively "reasonable." Because this is not a circumstance where the offense is silent on the mens rea, there is no gap for *Elonis* to fill. *See United States v. Rapert,* 75 M.J. 164, 168

12

(C.A.A.F. 2016) (because "the infirmities found in 18 U.S.C. § 875(c) [i.e., absence of mens rea] are not replicated" in the provision in question, this "places the case at bar beyond the reach of *Elonis*"); *United States v. Ulibarri*, 115 F. Supp. 3d 1308, 1333 (D.N.M. 2015) ("Unlike [18 U.S.C.] § 875(c), [the provision in question] already contains a *mens rea* requirement. . . . [Accordingly, b]ecause [the provision in question] already 'separate[s] wrongful conduct from otherwise innocent conduct,' *Elonis v. United States*, 135 S.Ct. at 2011, an additional *mens rea* requirement is unnecessary." (sixth alteration in original)); *see also People v. Murillo*, 238 Cal. App. 4th 1122, 1129, 190 Cal. Rptr. 3d 119 (2015) (noting *Elonis* does not affect the California appellate court's interpretation of the California statute punishing threats to witnesses, crime victims, or other persons), *review denied*, No. S228704 (Cal. Oct. 14, 2015); *State v. Gore*, 101 Wn.2d 481, 486-87, 681 P.2d 227 (1984) ("While the Supreme Court's interpretation of a similar federal statute is persuasive authority, it is not controlling in our interpretation of a state statute.").[7]

Finally, in *Elonis* the "jury was instructed that the Government need prove only that a reasonable person would regard Elonis's communications as threats." *Elonis*, 135 S. Ct. at 2012. The Court found such instruction to be error because "[f]ederal criminal

---

[7] *Elonis*'s limitations are noted in the following law review articles. *See* P. Brooks Fuller, *The Angry Pamphleteer: True Threats, Political Speech, and Applying* Watts v. United States *in the Age of Twitter*, 21 COMM. L. & POL'Y 87, 90-91 (2016) ("The Court in *Elonis* did not reach [any] First Amendment issue, and instead focused on [interpreting] the federal [threat] statute" at issue; thus, "the Court failed to clarify the practical boundary between protected speech and unprotected true threats."); *see also Federal Threats Statute—Mens Rea and the First Amendment*—Elonis v. United States, 129 HARV. L. REV. 331, 336 (2015) ("Because *Elonis* was decided on statutory grounds, 'true threats' remain a doctrinal puzzle for lower courts.").

liability generally does not turn solely on the results of an act without considering the defendant's mental state." *Id.* The Court acknowledged that such consideration of required mental state "is satisfied if the defendant transmits a communication for the purpose of issuing a threat, *or with knowledge that the communication will be viewed as a threat.*" *Id.* (emphasis added). Here, as noted, the Washington harassment statute requires the State to prove that the defendant "knowingly threaten[ed]." RCW 9A.46.020(1)(a). Because the required mental element in the Washington harassment statute is the same mental state acknowledged in *Elonis* as sufficient, appellant and amicus do not convince that *Elonis* impacts the present case.

### *Virginia v. Black*

Appellant maintains that his convictions are invalid under *Black.* He argues that "[b]ecause there was no evidence that Trey made the statements to his therapist with the *intent to intimidate* the boys, the convictions violate the First Amendment under *Black.*" Reply Br. of Appellant at 18 (emphasis added); *see also* Br. of Appellant at 28 (same); Appellant's Suppl. Br. on Certified Issue at 4. For the reasons noted here, appellant's reliance on *Black* is misplaced. While the state statute at issue in *Black* prohibited "cross burning with 'an intent to intimidate a person or group of persons,'" *Black*, 538 U.S. at 347 (quoting VA. CODE ANN. § 18.2–423), the "intent to intimidate" element was a state statutory requirement. It was a part of the given context of the Supreme Court's First Amendment inquiry in *Black*, but nothing in *Black* imposes in all cases an "intent to intimidate" requirement in order to avoid a First Amendment violation. *See Schaler*, 169

14

Wn.2d at 287 n.4 (distinguishing *Black*); *see also Elonis*, 135 S. Ct. at 2027 (Thomas, J., dissenting) (explaining the parameters and limitations of the *Black* decision).

Notably, this court has already distinguished *Black* in *Schaler*, acknowledging that the Supreme Court in *Black* "upheld a cross burning law without discussing any negligence requirement," but this was because "the law at issue in *Black* required an even greater mens rea as to the listener's fear[:] 'Intimidation . . . is a type of true threat . . . where a speaker directs a threat to a person or group of persons *with the intent of placing the victim in fear* of bodily harm or death.'" *Schaler*, 169 Wn.2d at 287 n.4 (second and third alterations in original) (citation omitted) (quoting *Black*, 538 U.S. at 360). Thus, the *Schaler* majority did not find *Black* to be germane to its interpretation or application of RCW 9A.46.020.

Justice Thomas's dissent in *Elonis* also described the parameters of the *Black* decision, further demonstrating how *Black* is too factually different to offer any guidance in the present case.[8] Justice Thomas explained:

> The Court's fractured opinion in *Black* . . . says little about whether an intent-to-threaten requirement is constitutionally mandated . . . . *Black* concerned a Virginia cross-burning law that expressly required "'an intent to intimidate a person or group of persons,'" 538 U.S., at 347, 123 S.Ct. 1536 (quoting Va.Code Ann. § 18.2-423 (1996)), and the Court thus had no occasion to decide whether such an element was necessary in threat

---

[8] While the majority in *Elonis* did not reach any First Amendment issues and did not mention *Black*, Justice Thomas's dissent did address the First Amendment and discussed the parameters and limitations of the Court's decisions in both *Black* and *Watts*. Relevant here, Justice Thomas explained that "[n]either of those decisions . . . addresses whether the First Amendment requires a particular mental state for threat prosecutions." *Elonis*, 135 S. Ct. at 2026 (Thomas, J., dissenting). He noted that "*Watts* expressly declined to address the mental state required under the First Amendment for a 'true threat.'" *Id.* And he further explained the limitations of the *Black* decision as described above. *Id.*

provisions silent on the matter. Moreover, the focus of the *Black* decision was on the statutory presumption that "any cross burning [w]as prima facie evidence of intent to intimidate." 538 U.S., at 347-348, 123 S.Ct. 1536. A majority of the Court concluded that this presumption failed to distinguish unprotected threats from protected speech because it might allow convictions "based solely on the fact of cross burning itself," including cross burnings in a play or at a political rally. *Id.*, at 365-366, 123 S.Ct. 1536 (plurality opinion); *id.*, at 386, 123 S.Ct. 1536 (Souter, J., concurring in judgment in part and dissenting in part) ("The provision will thus tend to draw nonthreatening ideological expression within the ambit of the prohibition of intimidating expression[.]").

*Elonis*, 135 S. Ct. at 2027 (Thomas, J., dissenting) (third alteration in original). Here, the Washington harassment statute contains no similar "presumption," the rejection of which a majority of the Court in *Black* agreed on. Otherwise, under federal precedent, the fractured plurality decision in *Black* provides no clear directive that would compel this court to abandon its precedent.[9]

The lead opinion in *Black*, addressing the intent to intimidate provision of the Virginia statute at issue, opined that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." 538 U.S. at 360. In this context, the lead opinion observed that "'[t]rue threats'

---

[9] *See Hertz v. Woodman*, 218 U.S. 205, 213-14, 30 S. Ct. 621, 54 L. Ed. 1001 (1910) ("[T]he principles of law involved not having been agreed upon by a majority of the court sitting prevents the case from becoming an authority for the determination of other cases, either in [the Supreme Court] or in inferior courts."); *see also Texas v. Brown*, 460 U.S. 730, 737, 103 S. Ct. 1535, 75 L. Ed.2d 502 (1983) (stating that plurality view that does not command majority is not binding precedent); *United States v. Pink*, 315 U.S. 203, 216, 62 S. Ct. 552, 86 L. Ed. 796 (1942) ("While it was conclusive and binding upon the parties as respects that controversy, the lack of an agreement by a majority of the Court on the principles of law involved prevents it from being an authoritative determination for other cases." (citations omitted)). *But see In re Det. of Reyes*, 184 Wn.2d 340, 346, 358 P.3d 394 (2015) ("A principle of law reached by a majority of the court, even in a fractured opinion, is not considered a plurality but rather binding precedent.").

16

encompass those statements where the speaker *means to communicate a serious expression of an intent to commit an act of unlawful violence* to a particular individual or group of individuals,"and that "[t]he speaker need not actually intend to carry out the threat." *Id.* at 359-60 (emphasis added). Even if this articulation of "true threat" in *Black* were applied in the present case, it would not substantively alter the relevant inquiry here. The Washington harassment statute requires the State to prove that defendant "knowingly threaten[ed]" to cause bodily injury. RCW 9A.46.020(1)(a)(i). A "threat" is an expression of an intention to inflict injury, damage, loss, or harm on another.[10] Accordingly, there is no practical difference between showing that the speaker "means to communicate a serious expression of an intent to commit an act of violence" and showing that the speaker "knowingly threatened." *Black* does not alter the inquiry here.

Finally, after *Black*, there continued to be disagreement among the federal circuit courts regarding the appropriate test for determining whether speech rises to the level of a true threat. This disagreement stems from the various readings of the Supreme Court's opinion in *Black*. As noted, the Supreme Court declined the opportunity in *Elonis* to address the constitutional question raised by *Black*. *See Elonis*, 135 S. Ct. at 2012.

---

[10] "Threat," as statutorily defined, "means to communicate, directly or indirectly the intent" to "cause bodily injury in the future to the person threatened or to any other person"; or to "cause physical damage to the property of a person other than the actor"; or to "do any other act which is intended to harm substantially the person threatened or another with respect to his or her health, safety, business, financial condition, or personal relationships." RCW 9A.04.110(28)(a), (b), (j).

Given the continuing disagreement and lack of definitive guidance from the Supreme Court, it cannot be said that the test this court employs is incorrect and harmful.[11]

Policy Contentions

Appellant contends that the facts of Trey's case urge adoption of a subjective intent standard. Appellant argues, "A child was convicted of felonies for statements made in therapy, even though talking through one's feelings in counseling should be encouraged. . . . [Trey] did exactly what a person should do when having frightening thoughts: he was open about his feelings in therapy." Appellant's Suppl. Br. on Certified Issue at 16-17. But talking through his feelings with his therapist is not what triggered the involvement of law enforcement. That resulted from the totality of the circumstances. *See State v. C.G.*, 150 Wn.2d 604, 611, 80 P.3d 594 (2003) (the nature of a threat depends on all the facts and circumstances). Trey's statement, combined with his change

---

[11] Both appellant and amicus rely on the fact that "several courts" after *Black* have applied a subjective intent standard. *See* Appellants's Suppl. Br. on Certified Issue at 4 (citing *United States v. Heineman*, 767 F.3d 970 (10th Cir. 2014); *United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011); *Brewington v. State*, 7 N.E.3d 946 (Ind. 2014), *cert. denied*, 135 S. Ct. 970, 190 L. Ed. 2d 834, *reh'g denied*, 135 S. Ct. 1524, 191 L. Ed. 2d 454 (2015)); *see also* Br. of Amicus ACLU at 5, 7. But this is the minority view. *See, e.g., Heineman*, 767 F.3d at 979 (acknowledging that "[o]ther circuits have declined to read *Black* as imposing a subjective-intent requirement").

Appellant further notes that this court followed the Seventh Circuit when it initially adopted the objective (reasonable person) standard in *Williams*, and urges this court to again follow the Seventh Circuit decision in *United States v. Parr*, 545 F.3d 491 (7th Cir. 2008), to apply a subjective intent test under *Black* when assessing a true threat. Appellant's Suppl. Br. on Certified Issue at 11-12. But *Parr* is ambivalent. *Parr* acknowledged the "objective 'reasonable person' test" as the majority rule, that after *Black* some courts applied a subjective test for true threats, that courts disagreed as to whether *Black* changed the test for true threats, and noted that the impact of *Black's* plurality decision is "unclear." *Parr*, 545 F.3d at 499-500. *Parr* determined that it "need not resolve the issue" since the jury was instructed on intent as defendant requested. *Id.* at 500. *Parr* does not compel application of a subjective intent test as appellant suggests.

in demeanor, his detailed plan for killing the boys, and his lack of any sense that doing so would be wrong convinced his therapist that his threat to kill the boys was serious and warranted reporting to law enforcement. As noted, Deputy Boyer separately interviewed Trey at length and was also convinced that his threat to kill the boys was serious. As this court held in *Schaler*, whether defendant's statements "were serious threats and that a reasonable speaker would so regard them, [or] . . . a cry for help from a mentally troubled [person], directed toward mental health professionals who could help him" is an appropriate question for the fact finder. *Schaler*, 169 Wn.2d at 289-90; *see Johnston*, 156 Wn.2d at 365 (whether language constitutes a true threat is an issue of fact for the trier of fact in the first instance). And as discussed below, the evidence was sufficient to sustain Trey's conviction under RCW 9A.46.020.

Amicus adds that the impetuousness of youth, coupled with the availability of social media, support adoption of a subjective standard so as to avoid unnecessary convictions of juveniles. Br. of Amicus ACLU at 11-15. Amicus cites to *State v. Kohonen*, 192 Wn. App. 567, 370 P.3d 16 (2016) as support, but *Kohonen* demonstrates the appropriateness of Washington's reasonable person test in the very context that amicus raises. In *Kohonen*, Court of Appeals, Division One, applied the reasonable person standard to reverse a misdemeanor cyberstalking (RCW 9.61.260) conviction of a high school student who sent "mean-spirited" tweets about a classmate. *Id.* at 583. Division One described the tweets' content as "hyperbolic expressions of frustration," noted that the evidence showed defendant's peers interpreted the tweets as such, and held

19

that a reasonable person in defendant's position would not have anticipated that the tweets would have been interpreted any differently. *Id.* Therefore, Division One held, "[I]nsufficient evidence was presented that the tweets constituted true threats." *Id.* *Kohonen* supports retention of Washington's reasonable person standard.

In sum (regarding the supplemental briefing on the certified question), *Elonis* is significant for present purposes in what it does not say. It provides no First Amendment true threat analysis. It resolved only how the federal threat statute, 18 U.S.C. § 875(c), is to be statutorily construed and has no application beyond that context. As for *Black*, the most that can be said is that courts remain divided after the Supreme Court's fractured decision in that case. Accordingly, appellant and amicus have not shown clear error warranting this court's abandonment of its First Amendment precedent.

(2) Sufficient evidence supports Trey's convictions for felony harassment under RCW 9A.46.020

Appellant contends that the State's evidence was insufficient to prove felony harassment under RCW 9A.46.020 for each of his three convictions. "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence carry equal weight when reviewed by an appellate court. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). A reviewing court defers to the fact finder on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. *State v. Rodriquez*, 187 Wn. App. 922, 930, 352 P.3d 200, *review denied*, 184 Wn.2d 1011, 360 P.3d 817 (2015).

This court has explained that the harassment statute

> requires that the perpetrator knowingly threaten to inflict bodily injury by communicating directly or indirectly the intent to inflict bodily injury; the person threatened must find out about the threat although the perpetrator need not know nor should know that the threat will be communicated to the victim; and words or conduct of the perpetrator must place the person threatened in reasonable fear that the threat will be carried out.

*J.M.*, 144 Wn.2d at 482. Appellant specifically contends that the evidence did not show that the victims *feared* that any threat to kill would be carried out, that any such fear was *reasonable*, or that such fear was caused by Trey's *words or conduct*. Br. of Appellant at 15-21.

Here, each boy testified that when he heard that he was on Trey's "hit list," he was "scared." 1 RP at 87, 91 (E.D.), 97, 105-07 (W.B.), 120-21 (G.C.). That is sufficient. As to reasonableness of the fear, appellant argues that because the news of Trey's hit list was not available until after he was in custody, any fear that the threat would be carried out was not reasonable. But the record shows that each boy heard that he was on the hit list before finding out that Trey was in custody. *Id.* at 94 (E.D), 104-06 (W.B.), 120-21 (G.C.). Thus, the reasonableness of such fear was a question for the trier of fact in light of the total context. Finally, appellant argues that "[n]one of the three alleged victims testified that they heard [Trey's] statements, either directly or indirectly." Br. of Appellant at 19. But neither direct communication nor conveyance of Trey's exact words was required. "The person to whom the threat is communicated may or may not be the victim of the threat." *J.M.*, 144 Wn.2d at 488. "[T]he person threatened *must find out about* the threat although the perpetrator need not know nor should know that the threat

21

will be communicated to the victim." *Id.* at 482 (emphasis added). Drawing all reasonable inferences in the favor of the State, the evidence was sufficient.

(3) Trey's statements qualify as true threats under Washington's reasonable person test

Relying on *Kilburn*, Trey asserts that his statements to his therapist were not true threats under Washington's reasonable speaker standard. He argues that in *Kilburn*, the alleged threat—that the speaker would "'bring a gun to school tomorrow and shoot everyone'"—was spoken directly to a victim, but still found insufficient. Br. of Appellant at 24 (quoting *Kilburn*, 151 Wn.2d at 39). Appellant argues that here, Trey's statements were spoken to his therapist and were "more vague" as to timing than the alleged threat in *Kilburn*. *Id.* at 25.

But the outcome in *Kilburn* turned on the speaker's demeanor. As the student spoke the alleged threat to a classmate, he was "half smiling" and "giggling" afterward. *Kilburn*, 151 Wn.2d at 52. Also, the victim's history with the speaker showed no basis or rationale for the threat. They had known each other for two years and had never had a fight or disagreement, and the speaker had "always treated [the victim] nicely." *Id.* By contrast, Trey's demeanor here was not flippant. Trey's therapist testified that he grew concerned as Trey's demeanor changed when he talked about killing the boys. Trey had a detailed plan, specific targets, and a history with the targets of some teasing and conflicts. Trey had been bullied at school and also had been suspended, which had upset him.

Appellant argues that a person in Trey's position—a reasonable teenager making statements to his therapist—would not foresee that the statements would be interpreted as a serious threat. But here, Trey's change in demeanor when describing his plan to kill the boys, the plan's depth of detail, and Trey's failure to acknowledge that shooting the boys would be wrong all argue in favor of this being a true threat. Further, Trey repeated his plan to kill the boys to Deputy Boyer, who also testified regarding the plan's depth of detail, Trey's demeanor, and Trey's absence of misgivings about what he was planning. Deputy Boyer testified that he "took it as a very credible threat due to [Trey's] detailed plan and the very matter-of-fact nature of how he explained doing it and putting his plan into action." 1 RP at 58. Trey told Deputy Boyer, "'I know right and wrong, but I'm having a hard time wanting to do the wrong things.'" *Id.* at 66.

Considering the entire context, a reasonable speaker in Trey's place would foresee that Trey's statements concerning his plan to kill the boys would be interpreted by a listener as a serious expression of intention to inflict bodily harm. In other words, Trey uttered a true threat under Washington's objective (reasonable person) test. *See Kilburn*, 151 Wn.2d at 46.

Finally, while the affirmance of Trey's convictions is compelled for the reasons discussed herein, we acknowledge that this case demonstrates the need to explore how our criminal justice system responds to juveniles with mental health issues. Knowing what we know about adolescent brain development, we must find alternative means for managing their behavior and providing therapeutic treatment, instead of criminal

prosecution. Trey M is a juvenile in crisis, and our criminal justice system must find ways to provide serious mental health care for such persons while holding them accountable rather than simply placing them inside our revolving door criminal justice system.

## CONCLUSION

We reject the invitation of appellant and amicus to abandon this court's settled precedent, which applies an objective (reasonable person) test in determining a true threat for First Amendment purposes. Appellant does not convince us that either the Supreme Court's recent decision in *Elonis* or its previous decision in *Black* require such a change. Under Washington's objective (reasonable person) test, the trial court correctly determined that the statements at issue here were true threats and that sufficient evidence supports appellant's convictions. We affirm appellant's conviction for three counts of felony harassment under RCW 9A.46.020.

No. 92593-3

_Madsen, C.J._

WE CONCUR:

_Johnson, J._ _Wiggins, J._

_Owens, J._ _González, J._

_Fairhurst, C.J._

_Stephens, J._ _Yu, J._

25

No. 92593-3

GORDON McCLOUD, J. (dissenting)—A troubled and bullied young high school student was in counseling to address trauma stemming from his childhood of abuse and neglect. Following coaxing from his therapist to discuss his angry thoughts and plans, and in the context of the therapist-patient relationship, he disclosed his desire to violently harm three other students. Thereafter, a deputy sheriff asked the young man to repeat what he had previously disclosed to the therapist. The young man—Trey M.—did as he was told. There was no evidence that Trey M. ever volunteered these statements without being coaxed by adults in positions of authority; there was no evidence that Trey M. ever actually communicated these statements to the three students directly; and there was no evidence that Trey M. intended, desired, or knew that his coaxed disclosures of these statements to responsible adults would be communicated to those three other students indirectly. In fact, the trial court judge explicitly found that Trey M. told the deputy sheriff "that he was having a hard time wanting to do the wrong

1

things." Clerk's Papers (CP) at 43 (Finding of Fact 1.10). Nevertheless, as a result of following the instructions of the therapist and the deputy sheriff to put his disturbing thoughts into words, Trey M. was charged with and convicted of three counts of felony harassment—for putting these thoughts into words.

I agree with the majority that these convictions were permissible under our current precedent; we have interpreted the felony harassment statute, RCW 9A.46.020, to reach statements like Trey M.'s therapeutic disclosures. But the time has come to abandon that precedent. To the extent that it allows felony convictions for merely negligent speech, this precedent violates First Amendment protections, conflicts with fundamental precepts of Anglo-American criminal justice, and—as this case amply demonstrates—establishes bad policy. U.S. CONST. amend. I. I therefore dissent.

## ANALYSIS

Trey M. was convicted of violating RCW 9A.46.020(1)(a), which makes it a felony to "*knowingly* threaten[] . . . [t]o cause bodily injury immediately or in the future to the person threatened or to any other person." (Emphasis added.) This court's decisions in *State v. J.M.*, 144 Wn.2d 472, 482, 28 P.3d 720 (2001), and *State v. Kilburn*, 151 Wn.2d 36, 84 P.3d 1215 (2004),[1] severely limited the reach of the

---

[1] The parties and the majority also cite *State v. Williams*, 144 Wn.2d 197, 207-08, 26 P.3d 890 (2001), as the source of our "objective" test for knowing threats (i.e., threats

modifier "knowingly." Those cases held that to commit felony harassment, a person must know he is *communicating*—that is, he may not be convicted for muttering a threat under his breath or recording it in a private journal—but need *not* know or intend that (1) this communication will actually reach the subject of the threat[2] or (2) the subject will actually feel threatened.[3] Accordingly, the majority in this case upholds Trey M.'s convictions despite the absence of any evidence that Trey M. knew or intended that the thoughts he put into words for his therapist would be transmitted to the other students as threats. Majority at 21 ("'[T]he person threatened *must find out about* the threat although the perpetrator need not know nor should know that the threat will be communicated to the victim'" (quoting *J.M.*, 144 Wn.2d at 482)). For the reasons given *infra*, I conclude that we must overturn *J.M.* and *Kilburn* and reverse T.J.M.'s convictions.

---

that are constitutionally proscribable and covered by our felony harassment statute). Majority at 7-8. But I note that *Williams* quoted the objective standard only in dicta because it was not at issue in that case. 144 Wn.2d at 203-11 (holding that felony harassment statute was unconstitutionally vague and overbroad because it proscribed threats to harm a person's "mental health" but did not define that term).

[2] *J.M.*, 144 Wn.2d at 476-82.

[3] *Kilburn*, 151 Wn.2d at 46-48.

3

I.  This court's decisions in *J.M.* and *Kilburn* violate the First Amendment protections implicitly recognized by the United States Supreme Court in *Virginia v. Black*[4]

Neither *J.M.*, nor *Kilburn*, nor any of our prior decisions interpreting the felony harassment statute addressed the United States Supreme Court's decision in *Black*, 538 U.S. 343. Trey M. argues that the First Amendment principles recognized in that case require reversal of his convictions. He is correct.

The majority dismisses *Black* as a "fractured plurality decision . . . [that] provides no clear directive . . . compel[ling] this court to abandon its precedent." Majority at 16. I agree that *Black* is a complicated case: it generated four separate opinions and a split among the federal courts of appeals. See discussion *infra*. But I disagree that *Black* can be reconciled with Trey M.'s conviction, under a negligence standard, for confiding in his counselor and law enforcement.

*Black* addressed a Virginia statute that criminalized cross burning "'on the property of another, a highway or other public place'" done "'with the intent of intimidating any person or group of persons.'" 538 U.S. at 348 (lead opinion) (quoting VA. CODE ANN. § 18.2-423). The statute also provided that "'[a]ny such burning of a cross shall be prima facie evidence of an intent to intimidate.'" *Id.* (quoting VA. CODE ANN. § 18.2-423). In other words, the statute provided that the

---

[4] 538 U.S. 343, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003) (plurality opinion).

act of burning a cross on public land, a highway, or the property of another triggered a presumption that the statute's mens rea element—intent to intimidate—was satisfied. At a trial for a violation of the statute, the defendant would have to rebut this presumption (or raise a reasonable doubt as to the fact of cross burning on property covered by the statute).

Eight justices agreed that this statute posed First Amendment problems[5]—they differed only as to the appropriate remedy for these problems. Of significance here, five justices agreed that although a state may criminalize "cross burning with intent to intimidate,"[6] it may *not* make the act of cross burning sufficient, by itself, to establish the prohibited intent.[7] These justices reasoned that if a jury was

---

[5] Three justices would have invalidated the statute as impermissibly content based rather than impermissibly overbroad. *Id.* at 386-87 (Souter, J., concurring in the judgment in part and dissenting in part). And Justice Thomas would have upheld the statute on the basis that it prohibited conduct rather than speech. *Id.* at 394-95 (Thomas, J., dissenting).

[6] *Id.* at 362 (lead opinion); *see also id.* at 368 (Stevens, J., concurring) ("[c]ross burning with 'an intent to intimidate,' Va. Code Ann. § 18.2-423 (1996), unquestionably qualifies as the kind of threat that is unprotected by the First Amendment"); *id.* at 368 (Scalia, J., concurring in part and dissenting in part) ("I agree with the Court that . . . a State may, without infringing the First Amendment, prohibit cross burning carried out with the intent to intimidate.").

[7] *Id.* at 365 (lead opinion) (concluding that the Virginia statute's "prima facie evidence" provision was unconstitutional because it facilitated the arrest, prosecution, and conviction of a person who burned a cross for political or cultural reasons instead of to intentionally intimidate), 368 (Stevens, J., concurring), 379 (Scalia, J., concurring in part and dissenting in part) (agreeing that Court must reverse conviction of defendant whose jury "was instructed that '[t]he burning of a cross, *by itself,* is sufficient evidence from which you may infer the required intent'" (alteration in original)).

5

permitted to convict on the basis of cross burning alone—and thus permitted to ignore other evidence relating to the defendant's motives for burning the cross—then the statute might sweep up constitutionally protected expression, which they defined as expression that was not *intended* to intimidate: "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons *with the intent* of placing the victim in fear of bodily harm or death." *Id.* at 360 (emphasis added). Accordingly, under *Black*, the First Amendment protects cross burning even when that act is carried out—by someone with full knowledge of its historical and symbolic significance—with the intent only to "creat[e] anger or resentment" or unite "a group of like-minded believers." *Id.* at 366.[8] It makes no difference what effect the cross burning *actually* has on anyone who witnesses it; the First Amendment protects that form of expression provided it is not *intended* to intimidate.

---

[8] *Black*, 538 U.S. at 365-66 (lead opinion) ("prima facie evidence" provision rendered Virginia statute facially overbroad because it "does not distinguish between a cross burning done with the [constitutionally protected] purpose of creating anger or resentment and a cross burning done with the [constitutionally proscribable] purpose of threatening or intimidating a victim"), 374 (Scalia, J., concurring in part and dissenting in part) (agreeing that the First Amendment prohibits the conviction of a person for cross burning without the intent to intimidate, but concluding that the number of such convictions likely to occur under the Virginia statute was too small to render the statute facially overbroad).

Unlike the majority, I am unable to conclude that *Black* protects cross burning but not statements like Trey M.'s, made first in the context of mental health treatment and then later repeated at the urging of a law enforcement officer.

To distinguish *Black* from this case, the majority relies on two sources of authority: a footnote to this court's decision in *State v. Schaler*, 169 Wn.2d 274, 287 n.4, 236 P.3d 858 (2010), and Justice Thomas' lone dissenting opinion in *Elonis v. United States*, ___ U.S. ___, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015). Majority at 14-16. Neither suffices.

The *Schaler* note *supports* rather than undermines Trey M.'s reliance on *Black*. In *Schaler*, a man in the throes of a mental breakdown called a crisis services hotline and, crying hysterically, confessed that he had either killed his neighbors or dreamed that he killed them. 169 Wn.2d at 278-80. After being involuntarily committed to a mental health facility, the man, who had not in fact killed anyone, continued to voice specific threats to kill his neighbors but "also said, 'I hope I didn't really kill her.'" *Id.* at 280. The State charged him with violating the antiharassment statute at issue in this case (RCW 9A.46.020(1)(a)(i), (b), and (2)(b)). *Id.* at 281. At trial, the man successfully requested a jury instruction requiring the State to prove that he *intended* to communicate a threat, but the jury was not also instructed on the definition of a "true threat," so this court reversed his conviction. *Id.* at 281-82, 288-

90. The defendant in *Schaler* did not challenge our objective definition of "true threat," based on the reasonable person standard[9]—instead, he argued only that "[i]n the context of his mental health evaluation . . . his words were a cry for help, and a reasonable person in his position would not foresee that a listener would take them as a serious expression of intent to kill." *Id.* at 284. This court agreed and, having no occasion to reconsider our objective standard, held that the jury in a harassment trial must be asked "whether a reasonable person in [the defendant's] position would foresee that his statements or acts would be interpreted as a serious expression of intent to carry out the threat." *Id.* at 290. When the *Schaler* court addressed *Black*—in the footnote relied on by the majority in this case—it was to point out that "the law at issue in *Black* required an *even greater* mens rea as to the listener's fear" and therefore supported reversal for a new, more defendant-protective jury instruction. *Id.* at 287 n.4 (emphasis added). This "distin[ction]," as the majority calls it,[10] supports *Trey M.'s* position in this case, not the State's.

As for Justice Thomas' dissent in *Elonis*—an opinion that no other justice signed—it cannot substitute for our own analysis of the *Black* decision itself. The

---

[9] Pet. for Review, *State v. Schaler*, No. 81864-9, at 13 (Wash. Aug. 19, 2008) (conceding that "[t]he true threat test is determined under an objective standard that focuses on the speaker" (citing *Kilburn*, 151 Wn.2d at 44)).

[10] Majority at 14.

8

majority eschews any such analysis in favor or Justice Thomas' assertion that *Black* "'says little'" about the constitutional question presented here. Majority at 15 (quoting *Elonis*, 135 S. Ct. at 2027) (Thomas, J., dissenting)). But for all of the reasons outlined above, this assertion is untenable.

Finally, it is true that a majority of the lower federal appellate decisions addressing the question—all decisions interpreting 18 U.S.C. § 875(c), the federal antithreat statute at issue in *Elonis*, 135 S. Ct. 2001—have rejected Trey M.'s reading of *Black*. Majority at 17. But those decisions are wrong. They begin and end with the observation that the *Black* Court "had no occasion" to impose a subjective intent requirement on "threat-prohibiting statutes" since the Virginia statute at issue already had such a requirement. *United States v. Jeffries*, 692 F.3d 473, 477-81 (6th Cir. 2012), *abrogated by United States v. Houston*, 792 F.3d 663, 667 (6th Cir. 2015); *see also United States v. Clemens*, 738 F.3d 1, 11 (1st Cir. 2013) (plain error review; citing *Jeffries*, 692 F.3d at 478, 480); *United States v. Nicklas*, 713 F.3d 435, 439-40 (8th Cir. 2013) (citing *Jeffries*, 692 F.3d at 479-80); *United States v. Martinez*, 736 F.3d 981, 986-87 (11th Cir. 2013) (citing *Jeffries*, 692 F.3d at 478-80), *vacated*, 135 S. Ct. 2758 (2015); *United States v. Elonis*, 730 F.3d 321, 331 (3d Cir. 2013) (citing *Jeffries*, 692 F.3d at 483), *rev'd*, 135 S. Ct. 2001. That may be true as far as the statute at issue was concerned, but it fails to acknowledge

9

the *Black* Court's actual analysis, which treated the statute's subjective intent element as *required* by the First Amendment. See discussion *supra*. Two circuit courts have recognized this implied holding in *Black*,[11] and a third has endorsed this view without reaching the question.[12] These courts have adopted the correct interpretation of *Black*; we should do the same.

II. This court's decisions in *J.M.* and *Kilburn* also violate the principle, applied in *Elonis*, that "wrongdoing must be conscious to be criminal"

While *Black* alone compels us to reverse Trey M.'s conviction, reversal is also supported by the United States Supreme Court's recent decision in *Elonis*, 135 S. Ct. 2001. As noted above and by the majority, *Elonis* addressed 18 U.S.C. § 875(c), the federal statute "mak[ing] it a crime to transmit in interstate commerce 'any communication containing any threat . . . to injure the person of another,'" 135 S. Ct. at 2004 (second alteration in original) (quoting 18 U.S.C. § 875(c)); majority at 10-11. Applying the principle—rooted in common law notions of basic justice—

---

[11] *United States v. Heineman*, 767 F.3d 970, 976-82 (10th Cir. 2014) (holding, after long discussion of the various opinions in *Black*, that that case "establish[ed] that a defendant can be constitutionally convicted of making a true threat only if the defendant *intended* the recipient of the threat to feel threatened"); *United States v. Bagdasarian*, 652 F.3d 1113, 1116-18 (9th Cir. 2005) (*Black* requires that federal statute be construed to require proof of subjective intent to threaten).

[12] *United States v. Parr*, 545 F.3d 491, 499-500 (7th Cir. 2008) (declining to reach the question but opining that after *Black*, "[i]t is . . . likely . . . that an entirely objective definition [of 'true threat'] is no longer tenable").

that "'wrongdoing must be conscious to be criminal,'"[13] the *Elonis* Court read an actual (subjective knowledge) requirement into 18 U.S.C. § 875(c). 135 S. Ct. at 2010. This requirement—that the government must prove an "evil mind" before imposing the stigma and disabilities of a felony conviction—stands at the heart of the United States' conception of criminal justice. *Staples v. United States*, 511 U.S. 600, 605, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994) ("'[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence'" (alteration in original) (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1952))).

The majority distinguishes *Elonis* on the ground that 18 U.S.C. § 875(c) "is silent on the scienter required to commit the offense." Majority at 11. According to the majority, Washington's felony harassment statute is not similarly "silent"—and thus does not trigger the rule of statutory construction applied in *Elonis*—because it penalizes a person who "'*knowingly threatens*'" another. Majority at 12 (quoting RCW 9A.46.020(1)(a)). But this distinction begs the question presented in this case: *What* must a defendant "know" in order to trigger liability under the felony harassment statute? And with respect to that question, *Elonis* is directly on point. It holds that in the context of threat prosecutions, the knowledge separating innocent

---

[13] *Elonis*, 135 S. Ct. at 2009 (quoting *Morissette v. United States*, 342 U.S. 246, 252, 72 S. Ct. 240, 96 L. Ed. 2d 288 (1952)).

11

from wrongful conduct is the defendant's actual "knowledge that the communication

will be viewed as a threat," *Elonis*, 135 S. Ct. at 2012:

> The "presumption in favor of a scienter requirement should apply to *each* of the statutory elements that criminalize otherwise innocent conduct." [*United States v.*] *X-Citement Video*, 513 U.S. [64,] 72[, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994)] (emphasis added). The parties agree that a defendant under Section 875(c) must know that he is transmitting a communication. But communicating *something* is not what makes the conduct "wrongful." Here "the crucial element separating legal innocence from wrongful conduct" is the threatening nature of the communication. *Id.*, 115 S.Ct. 464 at 73. The mental state requirement must therefore apply to the fact that the communication contains a threat.

*Id.* at 2011. The Court has consistently applied this presumption when interpreting

statutes that, like Washington's felony harassment law, penalize "knowing"

conduct.[14]

---

[14] *E.g.*, *Flores-Figueroa v. United States*, 556 U.S. 646, 647, 652, 129 S. Ct. 1886, 173 L. Ed. 2d 853 (2009) (identity theft statute required government to prove defendant "*knew*" that the 'means of identification' he or she unlawfully transferred, possessed, or used, in fact, belonged to 'another person'" because "courts ordinarily read a phrase in a criminal statute that introduces elements of a crime with the word 'knowingly' as applying that word to each element" (quoting 18 U.S.C. § 1028A(a)(1))); *X-Citement Video*, 513 U.S. at 67-68 (even though most natural reading of child pornography statute indicated that government need prove only defendant knew he transported, shipped, received, or distributed the prohibited materials, Court would construe statute so as to apply the modifier "knowingly" to the nature of the materials—i.e., the fact that they depicted minors engaging in sexually explicit conduct); *see also McFadden v. United States*, __ U.S. __, 135 S. Ct. 2298, 2303-06, 192 L. Ed. 2d 260 (2015) ("the most natural reading" of statute making it a crime "'knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance'" requires government to prove "that the defendant knew he was dealing with 'a controlled substance'" (quoting 21 U.S.C. § 841(a)(1))).

12

Finally, I note that although *Elonis* did not reach any First Amendment question—and thus did not explicitly state that a true threat requires subjective intent under *Black*—it did abrogate all of the federal decisions (discussed above) reaching the contrary conclusion.[15] As a result, only one interpretation of 18 U.S.C. § 875(c)—the federal threat statute at issue in all of those cases—survives today: the interpretation that avoids the First Amendment problem posed by criminalizing speech that is merely negligent.

III.   To the extent that they allow felony convictions for merely negligent speech, *J.M.* and *Kilburn* are incorrect and harmful

Before we may overturn our own precedent, there must be a clear showing that that precedent is both incorrect and harmful. *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970). For all of the reasons given above, I conclude that our decisions in *J.M.* and *Kilburn* are incorrect. To the extent that those decisions permit felony harassment convictions for merely negligent speech, they violate the First Amendment protections recognized in *Black*, 538 U.S. 343,

---

[15] *Martinez v. United States*, __ U.S. __, 135 S. Ct. 2798, 192 L. Ed. 2d 842 (2015) (vacating and remanding to the Court of Appeals for further consideration in light of *Elonis*); *United State v. White*, 810 F.3d 212, 220 (4th Cir. 2016) ("*Elonis* abrogates our prior holding that liability under [18 U.S.C.] § 875(c) can turn solely on how a recipient would interpret a statement, without regard to whether the speaker intended it as a threat"); *Houston*, 792 F.3d at 667 (holding that *Jeffries* has been abrogated by *Elonis*); *Nicklas*, 713 F.3d at 440 (no First Amendment error in permitting conviction, under 18 U.S.C. § 875(c), according to negligence standard); *Clemens*, 738 F.3d at 11 (not plain error to permit conviction, under 18 U.S.C. § 875(c), according to objective negligence standard).

13

and the principle of statutory construction applied in *Elonis*, 135 S. Ct. 2001. I also

conclude that *J.M.* and *Kilburn* are clearly harmful for two reasons.

First, *J.M.* and *Kilburn* infringe a constitutional protection. We have

previously held that such infringement constitutes "harm" sufficient to overcome the

rule of stare decisis. *State v. W.R.*, 181 Wn.2d 757, 769, 336 P.3d 1134 (2014) (prior

precedent harmful because it violated due process protections); *State v. Barber*, 170

Wn.2d 854, 871, 248 P.3d 494 (2011) (prior precedent harmful because it offended

separation of powers principles).

Second, we have found precedent clearly harmful where it creates significant

policy problems. *Barber*, 170 Wn.2d at 871 (collecting cases). *J.M.* and *Kilburn*

certainly fit this bill, as illustrated by their application to the facts in this case.

At Trey M.'s sentencing hearing—a proceeding at which every speaker

expressed concern and compassion for Trey M.—the judge imposed probation with

several conditions, including that Trey M. continue to participate in mental health

treatment. 3 Report of Proceedings (Dec. 19, 2014) at 262-63. When she imposed

that sentence, the judge struggled to explain to Trey M. why he was being punished

for the things he had previously said to his therapist and how he should proceed in

future therapy sessions:

> Well, this is a difficult, sad case. It's obviously been horrible for
> everybody, including Trey [M.]. And I think Trey[ M.]'s learned that

14

you can't make a plan to kill people and tell anybody about it, including your therapist. But on the other hand, you shouldn't be thinking that way. So that's the problem.

. . . And I think that your mind is unhealthy at this time. I understand that.

. . . .

. . . On the one hand, people should feel safe to make comments to a therapist in a therapeutic setting; on the other hand, this just went over -- over the line. So . . . [your therapist] felt that he had to report it. He was concerned enough that he reported it and, basically, things snowballed and a lot of people found out about it and it became very, very frightening for a lot of people.

. . . .

. . . Everybody has thoughts like you have. Some of them are spoken and some of them are unspoken, but we all do the best we can to make sure that other people aren't afraid of what we say, okay?

*Id.* at 257-61.

The judge's advice is consistent with our holdings in *J.M.* and *Kilburn*—it warns Trey M. that he faces criminal sanction as a felon for therapeutic disclosures that are "over the line," regardless of his criminal intent. *Id.* at 259. Under *J.M.* and *Kilburn* then, Trey M. must censor himself when he returns to therapy. Because this outcome is as frightening and counterproductive as it is unconstitutional, I would overturn those cases.

CONCLUSION

Imposing felony criminal liability for Trey M.'s disclosures—disclosures that were requested by adults in positions of authority—contradicts controlling United States Supreme Court precedents. It undermines constitutional rights, flouts the plain language of the felony harassment statute, and risks undermining attempts to achieve the trust necessary to address juvenile mental health issues. It also opens the floodgates to prosecutions for harsh language that the speaker did not intend to be frightening in other areas, like the political context. For all of these reasons, I respectfully dissent.