**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 50281-0-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| THORMOD NMI SKALD, | |
| Appellant. | |

MAXA, C.J. – Thormod Skald appeals his conviction of felony harassment – threat to kill with a special allegation of domestic violence regarding a threat he made to kill his former wife. We hold that the State presented sufficient evidence to establish that (1) Skald made statements that amounted to a true threat and (2) Gunnlaugsdottir was placed in reasonable fear that Skald would carry out his threat. We also hold that the claims Skald makes in a statement of additional grounds (SAG) lack merit. Accordingly, we affirm Skald's conviction.

FACTS

Skald and Asta Gunnlaugsdottir met and married in Iceland in 2007 before moving to the United States. They subsequently had two children. They moved to Poulsbo in 2011 and opened an ice cream shop together. Gunnlaugsdottir eventually started feeling depressed and uncomfortable in the marriage. She testified that Skald was controlling and had a bad temper. On one occasion, Skald struck Gunnlaugsdottir across the back.

In 2014, Gunnlaugsdottir went with the children to Iceland in an attempt to secure a loan for the ice cream business. While she was in Iceland, Gunnlaugsdottir decided that she wanted a

divorce. She filed for dissolution of the marriage in Washington in December 2014. The dissolution action involved ongoing custody issues.

While the dissolution action was pending, Skald constantly discussed Gunnlaugsdottir with the ice cream shop's employees, Anjela Hasseries and Amber Golding. Skald and Hasseries were close and shared a dark sense of humor. Hasseries testified that Skald first brought up problems with Gunnlaugsdottir in May 2015. Skald and Hasseries initially joked that hiring a hitman would be cheaper than hiring a lawyer. And Hasseries, who had medical issues at the time, joked that she could take Gunnlaugsdottir with her in a car and drive off a cliff. Hasseries testified that Skald was going through a lot and their jokes were a way to blow off steam. She explained, "So we would say it, we would laugh, and then we would move on." Report of Proceedings (RP) at 86.

Eventually, Skald's discussions turned more serious. In March 2016, he told Golding that he wanted to poison Gunnlaugsdottir with the extract of a plant used to make rosary beads. This raised a red flag for Golding, but she tried to brush it off. She thought he was just angry about his custody issues.

In July, Skald talked to Hasseries about poisoning Gunnlaugsdottir with dimethylmercury after watching a documentary in which a woman died a few months after getting that substance on her skin. Skald said that he could get some dimethylmercury on Gunnlaugsdottir's skin, and then she would die after returning to Iceland and the death could not be traced to him. Hasseries was "really creeped out" by this conversation. RP at 88. Skald had a similar conversation with Golding in June or July about exposing Gunnlaugsdottir to dimethylmercury, and about researching how to make it.

2

Early that summer, Skald also told Hasseries that he planned to shoot Gunnlaugsdottir with his shotgun. He said that if things did not go his way at a September custody hearing, he would shoot Gunnlaugsdottir in the courthouse parking lot afterwards. Hasseries did not think Skald was joking when he discussed the shotgun plan because it was very specific.

Skald also told Golding in August that he would like to kill Gunnlaugsdottir with his shotgun in the courthouse parking lot. According to Golding, Skald said, "I'll be damned if that bitch leaves with my kids again." RP at 122-23. Golding testified that she did not get the impression he was joking when he was talking about killing Gunnlaugsdottir. She thought he was serious, and she was concerned because he had thought out and researched plans.

Hasseries reported her conversations with Skald to law enforcement on August 23. She testified that she "wanted to wait until I was absolutely certain" before making the report. RP at 102. Hasseries testified that if she had not reported what had occurred, she believed that "there's a very good chance that [Gunnlaugsdottir] would be dead today." RP at 92.

Hasseries spoke with detective David Shurick. Shurick also interviewed Golding and Skald. On August 30, Shurick notified Gunnlaugsdottir of the criminal investigation. Because Gunnlaugsdottir was in Iceland at the time, they communicated by video call. Shurick testified that he told Gunnlaugsdottir what he learned during his investigation, but he did not otherwise testify about what was said during the conversation.

Gunnlaugsdottir explained that she became aware of statements Skald made about her when her attorney notified her that reports had been made to the police. She also testified that she spoke to a law enforcement officer about the issue, although she did not state specifically what she learned regarding Skald's statements. Gunnlaugsdottir did not expressly state that she

feared that Skald would carry out some threat, but she testified that she took what Skald had said very seriously.

Gunnlaugsdottir also testified that there was a scheduled custody hearing on September 2, 2016. But she had not been sure if she would be able to make that date because of immigration issues, and by the time she talked to Shurick she already knew that she would be unable to attend the hearing. Even so, she still planned on returning to the United States at some point and Skald was aware of her plan.

The State charged Skald with three counts of felony harassment – threat to kill, each with a special allegation of domestic violence. Each count referenced one of Skald's three alleged threats to kill Gunnlaugsdottir: with rosary bead extract, with dimethylmercury, and with a shotgun. After Skald was arrested, Shurick seized a shotgun and some shells from Skald's home.

At trial, Hasseries, Golding, Shurick, and Gunnlaugsdottir testified to the facts recited above. The jury found Skald guilty of the third felony harassment count, relating to the threat to kill Gunnlaugsdottir with a shotgun. The jury did not reach a verdict on the first or second counts. The trial court declared a mistrial on those two counts, and the State subsequently dismissed them.

Skald appeals his conviction.

## ANALYSIS

A. LEGAL PRINCIPLES – HARASSMENT

Under RCW 9A.46.020(1), a person is guilty of harassment if:

(a) Without lawful authority, the person knowingly threatens:

(i) To cause bodily injury immediately or in the future to the person threatened or to any other person; [and]
. . . .

(b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out.

Harassment is a gross misdemeanor unless the harassment involves "threatening to kill the person threatened or any other person." RCW 9A.46.020(2)(b)(ii). Harassment involving a death threat is a class C felony. RCW 9A.46.020(2)(b).

### 1. True Threat Requirement

RCW 9A.46.020 criminalizes pure speech. *State v. Kilburn*, 151 Wn.2d 36, 41, 84 P.3d 1215 (2004). But the First Amendment to the United States Constitution prohibits laws that abridge the freedom of speech. *Id.* at 41-42. Therefore, the harassment statute must be applied in conformance with the First Amendment. *Id.*

First Amendment protection does not extend to certain unprotected speech, including "true threats." *State v. Allen*, 176 Wn.2d 611, 626, 294 P.3d 679 (2013). As a result, we interpret RCW 9A.46.020(1)(a) as prohibiting only unprotected true threats. *Id.*

A true threat is " 'a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of another person.' " *Id.* (quoting *Kilburn*, 151 Wn.2d at 43) (internal quotation marks omitted). However, a communication using the wording of a threat but which in fact is merely a joke, idle talk, or hyperbole is not a true threat. *State v. Schaler*, 169 Wn.2d 274, 283, 236 P.3d 858 (2010). Courts identify a true threat using an objective standard that focuses on the speaker. *State v. Johnston*, 156 Wn.2d 355, 360-61, 127 P.3d 707 (2006).

A statement can constitute a true threat even if the speaker has no actual intent to carry out the threat. *Kilburn*, 151 Wn.2d at 46. This is because a true threat arouses fear in the person threatened, and that fear does not depend upon the speaker's intent. *Id.* The only question is

whether a reasonable speaker would foresee that the threat would be considered serious. *Schaler*, 169 Wn.2d at 283.

   2.   Reasonable Fear Requirement

Under RCW 9A.46.020(1)(b), the defendant's words or conduct must place the person threatened in reasonable fear that the threat will be carried out. This provision involves four general requirements.

First, the person threatened must find out about the threat, although the defendant need not communicate the threat directly to the victim and conveyance of the exact words of the threat to the victim is not required. *State v. Trey M.*, 186 Wn.2d 884, 905-06, 383 P.3d 474 (2016), *cert. denied*, 138 S. Ct. 313 (2017). The defendant need not know that the threat will be communicated to the victim. *Id.* at 906.

Second, the person threatened must subjectively fear that the threat will be carried out. *See State v. Cross*, 156 Wn. App. 568, 582, 234 P.3d 288 (2010), *cause remanded on other grounds*, 172 Wn.2d 1009, 260 P.3d 208 (2011); *State v. E.J.Y.*, 113 Wn. App. 940, 953, 55 P.3d 673 (2002).

Third, the threat made and the threat feared must generally be the same. *State v. C.G.*, 150 Wn.2d 604, 609, 80 P.3d 594 (2003).

Fourth, the victim's fear must be reasonable based on an objective standard, considering all the facts and circumstances of the case. *Cross*, 156 Wn. App. at 582; *E.J.Y.*, 113 Wn. App. at 953.

B.   SUFFICIENCY OF EVIDENCE CLAIMS

Skald argues that the State did not present sufficient evidence that he made a true threat or that Gunnlaugsdottir reasonably feared that he would carry out the threat. We disagree.

6

1. Standard of Review

Ordinarily, the test for determining sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). When contesting the sufficiency of the evidence, the defendant admits the truth of the State's evidence and all reasonable inferences drawn from that evidence. *Trey M.*, 186 Wn.2d at 905. Credibility determinations are made by the trier of fact and are not subject to review. *Id.* Circumstantial and direct evidence are equally reliable. *Id.* We apply this standard to the reasonable fear requirement.

However, because the true threat requirement implicates the First Amendment, we apply a more searching review to that requirement. *Kilburn*, 151 Wn.2d at 49. When assessing whether a statement is a true threat, we must engage in an independent review of the "crucial" facts that involve the legal determination of whether the speech is unprotected. *Id.* at 51-52. This review also may require us to look to the factual context in which the statement was made. *Id.* at 52. But we still defer to the fact finder on issues of credibility. *Id.* at 50.

2. True Threat Analysis

The question here is whether the State presented sufficient evidence that Skald's threat was made in a context or under such circumstances that a reasonable person would foresee that it would be interpreted as a serious expression of an intention to kill Gunnlaugsdottir. *See Allen*, 176 Wn.2d at 626. We hold that there was sufficient evidence of a true threat.

Skald told Hasseries and Golding of his three plans to kill Gunnlaugsdottir, including that he planned to shoot her with his shotgun in the courthouse parking lot. The threats came during

a dissolution and custody proceeding. While the dissolution action was pending, Skald constantly talked to Hasseries about Gunnlaugsdottir.

Although at first Hasseries and Skald were not serious when talking about hiring a hit man and driving Gunnlaugsdottir off a cliff, Hasseries began to take the threats seriously once Skald started talking about having an actual plan. Hasseries and Golding did not get the impression that Skald was joking when he started talking about killing Gunnlaugsdottir; they thought he was serious. And both employees testified that they were afraid that Skald would carry out his threat to shoot Gunnlaugsdottir.

The testimony of Hasseries and Golding is especially relevant in light of Skald's relationship with them. Notably, Hasseries and Skald had a particularly close relationship because they liked to share dark jokes with each other. This relationship put Hasseries in a position to notice a change in Skald's demeanor, and she took Skald's threats seriously once he developed an actual plan.

The Supreme Court cases addressing the true threat requirement have identified the impact context has on whether a statement constitutes a true threat. Relevant considerations include the manner in which the defendant made the threat, the defendant's relationship with the threatened person, and other indications that the defendant plans on carrying out the threat. *See Trey M.*, 186 Wn.2d at 906-08; *Schaler*, 169 Wn.2d at 291.

Here, Skald's demeanor provided a basis to find that he planned to carry out the threat. Hasseries testified that she noticed Skald became more serious when he talked about wanting to kill Gunnlaugsdottir. Further, Skald and Gunnlaugsdottir had a negative history during their marriage and Gunnlaugsdottir had filed for dissolution and had taken the children to Iceland. As a result, Skald had some motivation to threaten her. Skald's custody proceedings with

8

Gunnlaugsdottir gave him a motive to carry out his threat to kill Gunnlaugsdottir. Finally, Skald had detailed plans to carry out his threat.

Based on an independent review of the crucial facts presented, we hold that there was sufficient evidence to establish that Skald's threat to kill Gunnlaugsdottir was a true threat.

### 3. Reasonable Fear Analysis

We next consider whether the State presented sufficient evidence that Skald's threat to kill Gunnlaugsdottir placed her in reasonable fear that he would carry out his threat to kill her. RCW 9A.46.020(1)(b). We hold that the State presented sufficient evidence that Gunnlaugsdottir had such a fear.

### a. Knowledge of Threat

First, we must determine whether Skald's threat to kill Gunnlaugsdottir was relayed to her. *Trey M.*, 186 Wn.2d at 905-06. The record does not show exactly what Gunnlaugsdottir knew about Skald's threats. But Gunnlaugsdottir testified that she became aware of Skald's statements after her attorney told her that reports had been made to the police, and she also stated that she talked with an officer. Shurick testified that he spoke with Gunnlaugsdottir and told her what he learned during his investigation.

There is no requirement that the exact words of the threat be communicated to the victim. *Id.* at 906. Viewing all evidence and inferences in the State's favor, the evidence here supports an inference that Shurick spoke with Hasseries and Golding and learned about Skald's threats from them, and then he informed Gunnlaugsdottir of Skald's threats to kill her.

### b. Subjective Fear

Second, we must determine whether Gunnlaugsdottir subjectively feared that Skald would kill her. *Cross*, 156 Wn. App. at 582. In most cases involving the reasonable fear issue,

the threatened person had testified as to some level of fear. *See, e.g.*, *Trey M.*, 186 Wn.2d at 905 (holding statements that threatened persons were "scared" was sufficient); *E.J.Y.*, 113 Wn. App. at 953 (statement of concern that the defendant would come back and "shoot up the place" was sufficient, as was another person's statement that she felt "a little frightened").

Here, Gunnlaugsdottir did not expressly testify that she feared Skald would carry out his threat to kill her. But she testified that she took Skald's statements very seriously:

> Q. . . . [W]ithout talking about what [Shurick] told you, did you take what the defendant had said seriously?
>
> A. Yes. Very.

RP at 145-46.

Even though this evidence is minimal, we must view the evidence, including all reasonable inferences, in the light most favorable to the State. *Homan*, 181 Wn.2d at 105-06. Gunnlaugsdottir's testimony that she took the threat seriously supports a reasonable inference that she feared that Skald would carry out the threat to kill her. A person who did not fear that a threat would be carried out likely would not take the threat very seriously.

### c.   Identity of Threat Made and Threat Feared

Third, we must determine whether there was sufficient evidence that Skald's threat to kill Gunnlaugsdottir is the same threat that she feared. *C.G.*, 150 Wn.2d at 610. In *C.G.*, a vice principal was attempting to remove a disruptive student from her classroom when the student said that she would kill him. *Id.* at 606-07. The vice principal testified that the student's comments caused him "concern" that the student might try to harm him or someone else in the future. *Id.* at 607. The court held that this was insufficient evidence to prove felony harassment because the vice principal did not testify that he feared the student would *kill* him. *Id.* at 610.

Here, Gunnlaugsdottir did not expressly testify that she feared that Skald would kill her. However, as noted above, it can reasonably be inferred that Gunnlaugsdottir was told about Skald's multiple threats to kill her and she stated that she took what he had said very seriously. The fact that Gunnlaugsdottir took Skald's threats to kill her seriously supports a finding that she was afraid he would kill her as opposed to merely harming her.[1]

    d.    Reasonableness of Fear

Fourth, we must determine whether there was sufficient evidence Gunnlaugsdottir's fear that Skald would kill her was objectively reasonable. *Cross*, 156 Wn. App. at 582. Here, Skald had a specific plan to shoot Gunnlaugsdottir and also discussed killing her in other ways. He had a shotgun at his house, and it can be inferred that Gunnlaugsdottir knew that fact. Skald had a reason to be angry with Gunnlaugsdottir because she had filed for dissolution of their marriage and had taken their children to Iceland, and he had a bad temper and had hit her in the past. This evidence supports a finding that Gunnlaugsdottir's fear was reasonable.

Skald argues that Gunnlaugsdottir's fear was not reasonable because she did not hear of the threat from Skald himself or from Hasseries and Golding. But how a threatened person learns of the threat is immaterial. The court in *Trey M.* addressed a similar situation, in which the defendant told a school counselor that he wanted to shoot three classmates. 186 Wn.2d at 888-89. The classmates learned of the threat in various ways, including when one of them texted another. *Id.* at 890. The court rejected the defendant's argument that the classmates' fear was not reasonable because they did not hear the defendant's statements directly or indirectly. *Id.* at 906.

---

[1] Skald vaguely suggests that the State had to specifically prove that Gunnlaugsdottir feared that Skald would kill her *with a shotgun* rather than in some other way. But he does not support this suggestion with any argument or authority, and therefore we do not address this issue.

Skald also argues that Gunnlaugsdottir's fear was not reasonable because she knew that she would not be attending the September custody hearing when she learned of Skald's threat. But it was undisputed that Gunnlaugsdottir planned on coming back to the area at some point and that Skald knew of her plan. Skald does not identify any reason why it would not be reasonable for Gunnlaugsdottir to fear that he would carry out his threat at the first opportunity, rather than solely after the September hearing.

e.  Summary

Drawing all reasonable inferences in the State's favor, a rational trier of fact could have concluded that Gunnlaugsdottir was told about Skald's threats to kill her, that she subjectively feared that he would carry out the threats, that what she feared was that he would kill her as opposed to merely harming her, and that her fear that Skald would kill her was objectively reasonable. Accordingly, we hold that the State presented sufficient evidence that Skald's threat to kill Gunnlaugsdottir placed her in reasonable fear that he would carry out his threat.

C.  SAG CLAIMS

In a SAG, Skald asserts several grounds for reversing his conviction. However, Skald's SAG merely provides his analysis of the evidence presented at trial. He argues that the evidence against him was insufficient, certain evidence should have been given more weight, the witnesses who testified against him were mistaken or lying, and that his conviction was based on speculation.

We defer to the jury on questions of conflicting testimony, witness credibility, and persuasiveness of evidence. *State v. Rodriquez*, 187 Wn. App. 922, 930, 352 P.3d 200 (2015). Applying this principle, we reject Skald's SAG claims.

No. 50281-0-II

CONCLUSION

We affirm Skald's conviction.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

MAXA, C.J.

We concur:

WORSWICK, J.

LEE, J.