IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  37708-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| WIZA NYASULU, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Wiza Nyasulu appeals, on evidentiary, sufficiency of evidence, and ineffective assistance of counsel grounds, his jury conviction for felony harassment.  We reject his assignments of error and affirm his conviction.

FACTS

This prosecution arises from alleged death threats, uttered by Wiza Nyasulu (Nyasulu) to his estranged wife Amanda, to kill Amanda's boyfriend, Tyler Smith.  Nyasulu earlier nobly served in the Army and completed a tour of duty in Iraq.  He owned several handguns and rifles.

Wiza and Amanda Nyasulu married one another.  The couple resided in Snohomish County.  Amanda bore son Jim from a previous marriage.  Wiza and Amanda Nyasulu begat daughter Jane.  We use pseudonyms for both children.

Wiza and Amanda Nyasulu engaged in a bitter marital separation.  On separating, Amanda began a relationship with Tyler Smith.  On December 23, 2019, Wiza Nyasulu obtained a temporary protection order against Amanda.

Amanda Nyasulu went to Tyler Smith's Lincoln County lake house for the 2019 Christmas holiday.  On December 26, Amanda rested at the lake house with her two children, while Smith was away.  Amanda received a phone call from a number she did not recognize.  On answering the phone, she recognized the caller as Wiza Nyasulu.

Amanda Nyasulu placed Wiza Nyasulu's call on speakerphone and employed Jim's cellphone to record the call.  Nyasulu writes in his brief that Amanda did not begin recording the conversation until Amanda declared that she would not permit Nyasulu to see the children.  According to Nyasulu, he began to rant only after this remark by Amanda.  He cited Report of Proceedings (RP) 262 for these factual proposition, but the page does not confirm these alleged facts.

The recording captured most of the eighteen-minute conversation:

> [Amanda]: And you are violating your own protection order and you need to stop contacting me.
> [Wiza]: I think—well, I hope you enjoy a life without your friend because he no longer exists.

2

[Amanda]: Who doesn't no longer exist?  What are you talking about?

[Wiza]: Doing what I'm trained to do.

[Amanda]: And what are you trained to do?

[Wiza]: Intelligence operations.

[Amanda]: You better not hurt him.  Do you understand me?

[Wiza]: Why do you care?  You don't love him.

[Amanda]: I do love him.

[Wiza]: He no longer exists then.

[Amanda]: You need to stay away from him.

[Wiza]: That sounds like a personal problem for him.

[Amanda]: You need to stay away from him.

[Wiza]: Well, tell the coward he's gonna die.

[Amanda]: You better stay away from him.

[Wiza]: I will not go near him.  You do realize I could shoot from about a mile away with a 50 cal.?

[Amanda]: You need to stay away from him.

[Wiza]: You have no idea what I have been trained to do.

[Amanda]: Do you understand me?  You need to stop contacting me and do not go near him.

[Wiza] It sounds like a personal problem.  I'm only going to contact you about the kids via text message.  And you need to give them to me for a day.

[Amanda]: No, you do not—

[Wiza]: Otherwise,—

[Amanda]:—come near them.

[Wiza]: I guess he's gonna die then.

[Amanda]: You—

[Wiza]: I guess you don't love him that much.

[Amanda]:—I do love him and you need to stop.

[Wiza]: I guess he's gonna die then.  Either you give me the kids or he's gonna die.  You—now, are the kids more important, or is he more important?

[Amanda]: You need to stop.

[Wiza]: He's gonna die.

[Amanda]: You—

[Wiza]: I guess you don't love him.  [Inaudible on tape—muffled].  I guess you made the choice.  He's gonna die.

[Amanda]: You better stay away from him?

3

[Wiza]: Why?  That bitch [inaudible on tape—muffled] no one.

[Amanda]: Excuse me?

[Wiza]: He is a bitch.  And he is going to die.  And that's on you.

[Amanda]: That is not on me.

[Wiza]: Yes, it is.  He's dead.

[Amanda]: No, he is not.  You leave him alone.  He has nothing to do with this.

[Wiza]: He's going to die tomorrow.

[Amanda]: You better leave him alone.  He has nothing to do with this.

[Wiza]: No.  He's dead.  I don't care.  He's dead.  Or you give me my kids today.  If I don't have my kids today, he's dead tomorrow.

[Amanda]: I am done talking to you.

[Wiza]: Okay.  Okay.  I guess you don't value his life.  He's dead tomorrow.  I guess you don't love him.

[Amanda]: I do love him, and you leave him alone.

[Wiza]: He's dead.  I'm sorry.  You made your choice.  So, he dies tomorrow.

[Amanda]: You are not getting the kids and you are not—

[Wiza]: Okay.  I will not get the kids, but your boyfriend will be dead tomorrow.

[Amanda]: You do not [inaudible on tape—muffled] him—

[Wiza]: That sounds like a personal problem.  He's dead.

[Amanda]: Wiza!

[Wiza]: Say goodbye tonight.

[Amanda]: Wiza!

[Wiza]: Say goodbye tonight because all of your clothes, your lingerie, all of that's gone since you love him, will be burned today.  Again, he's dead tomorrow.  Say goodbye.

[Amanda]: I am not saying goodbye to him.

[Wiza]: Tell him—say goodbye to him tonight because he is dead.

[Amanda]: You are not—

[Wiza]: I will end his life and it will be glorious.  Say goodbye.

[Amanda]: I am not saying goodbye to him.

[Wiza]: Say good—well, say goodbye.  I guess it'll just be that terrible for you; but he's dead.  Tell the cowards [sic].

[Amanda]: Wiza!

[Wiza]: He is going to die tomorrow.

[Amanda]: You do not touch him.

[Wiza]: I'm not gonna touch him.  I could have reached him from a mile away.  You have no idea what I did in the military.  You have no clue.

[Amanda]: He has nothing to do with this.

[Wiza]: So, because I love the kids, it won't be an IED, but he's dead tomorrow.  Say goodbye.

[Amanda]: I am not saying goodbye to him and you are not coming—

[Wiza]: Or bring my kids. Okay.

[Amanda]:—ex—

[Wiza]: You could—you don't have to say goodbye to him.  He's still gonna die.

[Amanda]: It's worth you going to jail for the rest of your life just to kill the man I love?

[Wiza]: I will not go to jail for the rest of my life because you assume that you can prove it.

[Amanda]: I can prove everything.

[Wiza]: No, you can't.

[Amanda]: Yes, I can.

[Wiza]: No.  You assume it's going to be my time and you assume it's going to be tomorrow, because it might be tonight.  But he's a dead man walking.

[Amanda]: Why are you calling from a 509 number?

[Wiza]: Because my name is Tyler Robert Smith, and I am feeling suicidal and I just put a .9 millimeter or a .22 caliber bullet like the one that he left in my house through my own fucking head.

[Amanda]: So, you're going to kill yourself now?

[Wiza]: Oh, hell no.  I love myself too much.  No, I'm just going to kill him, and I'll just leave the bullet from his own gun.

[Amanda]: Oh, so—excuse me?  I did not hear that?

[Wiza]: That he left in my house.

[Amanda]: He's never even—

[Wiza]: Found the bullet in his gun.  You know, the one that he left for me in my house?

[Amanda]: He's never brought a weapon into our house.

[Wiza]: I said the bullet casing that he left in my house.

[Amanda]: Oh.  So, you're going to try to frame him?

[Wiza]: No, it's just gonna be a suicide.

[Amanda]: Oh, so you're going to kill yourself?

[Wiza]: No, he's gonna commit suicide.

[Amanda]: Oh.  So, you're going to kill him and frame him, claiming suicide?

[Wiza]: No.  Not at all.  He's going to commit suicide.  He already did.

[Amanda]: No, he is not.

[Wiza]: Yes, he's alive right now, but he's about to.

[Amanda]: You go nowhere near him; do you understand me?

[Wiza]: You can't tell me what to do.  But yes, he is a coward and—

[Amanda]: He is not a coward.

[Wiza]:—I don't know why you would leave cowards around children.

[Amanda]: And why are you sitting there and taking something out on him that has nothing—

[Wiza]: Because I was joking.

[Amanda]: You were joking just now?

[Wiza]: Yes.  Why would I want to get back with you and be treated like trash?

[Amanda]: Then why does Tyler have anything to do with this?  Why does he have to die?

[Wiza]: Because he just needs to die.

[Amanda]: Why does he need to die?

[Wiza]: Because I love my kids, they need their mother, and he needs to die because he keeps contacting me.

[Amanda]: He does not keep on contacting you.  You blocked his phone number.

[Wiza]: Because I threatened him.  And then blocked him.  Hopefully, there's not a brush fire at the end of [the road leading to Smith's house in] Spokane, Washington?  I'm really glad you got your tubes tied though because his inferior DNA will not get passed on to any more generations because that—that's [inaudible on tape—muffled]—not something that [inaudible on tape—muffled] live anymore.

[Amanda]: It's really scaring me that you have came [sic] to this.  I don't understand.

[Wiza]: You're not scared.

[Amanda]: Yes, I'm—

[Wiza]: You're a liar.  I will never hurt you.

[Amanda]: Excuse me?

[Wiza]: I said I will never hurt you.

[Amanda]: But you're gonna hurt the man that I love?

[Wiza]: Yeah. He'll die and burn. Maybe [inaudible on tape—muffled] burned alive in front of you. I don't know.

[Amanda]: Oh, you're—you're going to kill him and burn him alive in front of me?

[Wiza]: I didn't say I was going to kill him.

[Amanda]: You've told me multiple times on this con—phone call that you were going to kill him.

[Wiza]: No. I'm not going to kill him.

[Amanda]: Oh.

[Wiza]: And he will burn.

[Amanda]: And he's—you're just going to burn him alive?

[Wiza]: Mmm hmm. [Affirmative]. And then call the medics so they can resuscitate him.

[Amanda]: You're sick.

[Wiza]: No. You're my wife—

[Amanda]: I am—

[Wiza]:—but you love another man.

[Amanda]:—I am—I am counting the days until I am not your wife.

[Wiza]: No, you're not.

[Amanda]: Yes, I am.

[Wiza]: You love me.

[Amanda]: Tell me again why you're calling from a 509 number?

[Wiza]: Because it's my new number.

[Amanda] You have a Moses Lake number now?

[Wiza]: Mmm hmm. [Affirmative].

[Amanda]: Why?

[Wiza]: Why what?

[Amanda]: Why do you have a 509 number, a Moses Lake number?

[Wiza]: Because I live in Spokane.

[Amanda]: You do not live in Spokane.

[Wiza]: Yes, I do.

[Amanda]: The[n] who is at our house?

[Wiza]: No one.

[Amanda]: So, nobody is taking care of the animals?

[Wiza]: You should be.

[Amanda]: I can't be there. I—you—just tran—sent me a—I can't be at my house because you falsified court documents—

[Wiza]: I didn't falsify anything.

[Amanda]:—I—everything that's in that paperwork—

7

[Wiza]: I told the truth.

[Amanda]:—I have never did any of that to you.

[Wiza]: Yes, you have.

[Amanda]: You—you—you said that I—

[Wiza]: And you continued to do things.

[Amanda]:—you're insane.  You're insane.

[Wiza]: No, I am not.

[Amanda]: You are literally insane.

[Wiza]: No, I just loved you and you didn't love me.

[Amanda]: And so now you—because I didn't love you, now you're trying to have a domestic violence case and take everything away from me. And you're saying that I—all of—all of your snoring surgeries was a result of me?  Really?

[Wiza]: I can't hear you.

[Amanda]: All of your surgeries for your snoring—

[Wiza]: Hello?  What?

[Amanda]:—all of your—all of your surgeries for your snoring is a result from me?

[Wiza]: Yeah.

[Amanda]: Really?  You had all of those surgeries because—

[Wiza]: Well, it's because you harmed me, and you beat me and hit me in the face.

[Amanda]: Oh, yeah.

[Wiza]: Broke my nose and all of that.

[Amanda]: When?  When did that happen?

[Wiza]: Well, do you remember when we were camping, and you hit me in the face and all of the other times after that.  And then the other house.

[Amanda]: I love that—

[Wiza]: You hit me in the face.

[Amanda]:—you are falsifying—you are falsifying—

[Wiza]: I'm not falsifying anything.  I am telling the truth and you are just not willing to admit.

[Amanda]:—if any of that happened, then why didn't you call the police?

[Wiza]: Because I love you.

[Amanda]: You do not love me and stop telling me that.

[Wiza]: I do love you.

[Amanda]: No, you don't.

[Wiza]: Yes, I do.

[Amanda]: You need to stop contacting me and I am going to hang up.

[Wiza]: But I love you with—I still love you with all my heart.

[Amanda]: I can tell that you've been drinking.

[Wiza]: I have not been drinking.

[Amanda]: So, this is how crazy you usually are?

[Wiza]: No. I'm not crazy at all. I'm just in love with you.

[Amanda]: You need to leave me alone.

[Wiza]: Okay.

[Amanda]: And do not contact me.

[Wiza]: He's going to die.

[Amanda]: He is not going to die. And you need to leave me alone.

[Wiza]: Tell the coward to take his last breath and contact [inaudible on tape—muffled].

[Amanda]: Where are you?

[Wiza]: I'm at the house.

[Amanda]: Well, then why did you just tell me that you weren't at the house and that—the animals weren't being taken care of?

[Wiza]: Of course I'm going to take care of the animals. I love my dogs and my chickens.

[Amanda]: I am going to hang up the phone now and you need to no longer contact me.

[Wiza]: Yes, I will. But if you do not give me my kids today your boyfriend will die tomorrow. Do you want him to die?

[Amanda]: He is not going to die, and you need to leave him alone.

[Wiza]: He will die unless you want to see each one of his relatives die.

[Amanda]: Oh, so you now—

[Wiza]: Before he does.

[Amanda]:—so now you're wanting to kill all of his relatives also?

[Wiza]: I have all of them.

[Amanda]: You have all of them?

[Wiza]: And yes, they will die. I have every—you do realize before you even told me anything that I knew on—about the 23rd—about everything and background checks are done so I knew all of the numbers and everybody [inaudible on tape—muffled]?

[Amanda]: Wiza—

[Wiza]: So, yes, I know where everybody is.

9

> [Amanda]: Wiza—
> [Wiza]: Do you want them to die?
> [Amanda]: Wiza!
> [Wiza]: Do you want them to die?
> [Amanda]: No.  And no you are not going to hurt—
> [Wiza]: Then give me my children.
> [Amanda]:—do you think I'm actually going to give you the children with you acting this way?
> [Wiza]: I guess you don't love him.
> [Amanda]: I do love him.
> [Wiza]: He's dead. He's dead.
> [Amanda]: Goodbye Wiza.
> [Wiza]: Dead.
> [Amanda]: Goodbye Wiza.
> [Wiza]: That sounds like a personal problem.  He's gone.
> [Amanda]: Goodbye. . . .  no, you are unable to see the kids and you are violating—

RP at 262-77 (alterations in original).

Wiza Nyasulu testified at trial.  According to Nyasulu, he imbibed alcohol on the night of December 26, although he did not remember the amount of alcohol.  He purchased a fifth and drank from the bottle.  He also took Adderall.  He averred that he had not slept for three or four days.  He claimed that he remembered nothing about what he said during the call because of his blurry condition.  According to Nyasulu, his memory did not return until January 1.  Nyasulu denied ever intending to harm Tyler Smith.

During trial, Amanda Nyasulu testified to the familiarity and competence of Wiza Nyasulu with weapons.  She declared that she was afraid for Tyler Smith's life.  On questioning by the prosecutor, Amanda answered:

10

[Prosecutor:] Do you believe that [Wiza]—at that time did you believe that he had the capacity or the ability to carry out these threats?
[Amanda:] Very much so.
Q. Did those threats—did you actually believe that he may carry out those threats?
A. Yes.
Q. Was—did you feel in any way that he might have just been joking or [inaudible on tape—muffled]?
A. No.

RP at 192 (some alteration in original).

Amanda Nyasulu also testified:

Q. Did he give you any sort of ideas to a timeline as to when he might be—carry out some of these threats?
A. He said repeatedly tonight or tomorrow.

RP at 183. According to Tyler Smith, he continued to be frightened of Wiza Nyasulu at the time of trial.

On December 26, 2019, Amanda Nyasulu and Tyler Smith reported the phone call to the Lincoln County Sheriff's Office. Amanda and Smith also filed for a protection order that day.

Amanda Nyasulu averred that she and Tyler Smith installed security systems at Smith's home, Smith's lake house, and Amanda's home in Arlington. In his brief, Wiza Nyasulu contends Amanda installed the security cameras weeks after December 26. The record does not show the date of installation, and Nyasulu does not cite any page of the proceedings supporting this alleged fact.

11

PROCEDURE

The State of Washington charged Wiza Nyasulu with felony harassment.

On cross-examination of Amanda Nyasulu during trial, defense counsel attempted

to introduce a video purportedly showing Amanda laughing when her daughter called

Wiza Nyasulu a "sociopath." According to defense counsel, the video had been

circulated before the December 26 phone call. In the presence of the jury, defense

counsel questioned Amanda:

> [Defense counsel:] You encouraged the—your two kids, the witnesses, to speak poorly of their father, haven't you?
> [Amanda:] No.
> . . . .
> Q. You asked your daughter, [Jane], do you want to see Wiza? Have you ever talked to Wiza? Why don't you want to see him? And she answered because he's a—because he's a sociopath and you just laughed and laughed and laughed, didn't you?
> A. Her response yes.
> Q. So, this exists—this exists, in fact?
> A. I never encouraged that, no.
> Q. But—and—and—but—when she's saying these bad things, you just laughed and laughed and laughed, correct?
> A. I did laugh at her response, yes.
> Q. Yeah. [Inaudible on tape—muffled]—did you—did you know I had that video?
> A. I have that video.
> Q. Did you know I had that video?
> A. No, I did not.
> . . . .
> Q. You thought that this video was so entertaining that your daughter would say these things about her father that you shared them with your friends, correct, and Tyler's family?
> A. Not that I know of, no.

12

> Q. Okay. Well, let me ask you this, Tyler then shared it with a
> bunch of people and then it got to me somehow.
> [Prosecutor]: Objection. That's facts not in the record, Your Honor.
> [Defense counsel]: Could I—Could I—
> [The Court]: Sustained. Do you want to rephrase—or do you have
> another question then?
> [Defense counsel]: Yeah.
> [The Court]: Okay.
> . . . .
> Q. Should we play that for the jury?
> A. Sure.

RP at 203-05.

Defense counsel then attempted to introduce the video as an exhibit to play to the

jury. The State's attorney objected. The trial court instructed defense counsel to ask

more specific questions to clarify the event Amanda was denying occurred if counsel

wished to utilize the video for impeachment purposes. Questioning by defense counsel

continued:

> [Defense counsel:] So, you filmed a video of your daughter and
> asked if she wanted to see her father and she said no and then you laughed
> and then you asked her why not and she said because he's a psychopath and
> then you just cackle with laughter at that point, correct?
> [Amanda:] I don't recall.

RP at 212.

Both counsel then debated whether the defense could introduce the video for

impeachment or, alternatively, to refresh Amanda Nyasulu's recollection. Amanda had

admitted to laughing at Jane's response. The trial court excused the jury.

13

Outside of the jury's presence, defense counsel asked Amanda Nyasulu more questions. She did not recall if she retained a copy of the video or the purpose for disseminating the video. The prosecutor, defense counsel, and trial court further deliberated whether defense counsel could play the video to the jury. The court again desired more specific questions this time before the jury.

In the jury's presence, questioning by defense counsel of Amanda Nyasulu continued:

> Q. You made a video interviewing your daughter asking her how she feels about her father?
> A. About if she wants to see her father, yes.
> Q. And, in the video, she says she doesn't want to see him, correct?
> A. Yes.
> . . . .
> Q. But no, I know you were listening while she was speaking. And then, she was done speaking and then you responded. Tell the jury how you did.
> A. At what point of the video?
> Q. Right after she said she didn't want to see her dad?
> A. I did not say anything. I asked her the reasoning why.
> . . . .
> Q. You laughed after she said she didn't want to see her dad, correct?
> A. Not that I recall.

RP at 224-25.

Defense counsel next attempted to introduce the video to refresh Amanda's recollection. The trial court sustained an objection due to lack of foundation. The court later commented that "initially I understood [the video] was for impeachment purposes;

14

but I didn't feel the questions asked were sufficient to go and to allow this to be impeached." RP at 288. Defense counsel agreed that Wiza Nyasulu intended to introduce the video only for impeachment purposes.

On redirect examination of Amanda Nyasulu, the prosecution asked:

[Prosecutor:] Do you try to denigrate [Wiza Nyasulu] in front of the children?
[Amanda] Can you explain what that word means?
Q. Do you try to—do you try to talk bad about him?
A. No.

RP at 240.

At the close of Amanda's testimony, defense counsel again attempted to introduce the video by arguing that the State had opened the door by its questioning of Amanda Nyasulu on redirect. The trial court denied the motion.

During Amanda Nyasulu's testimony, the defense also sought to introduce a text message, dated January 4, 2021, from Tyler Smith to Amanda. Smith wrote that he wanted to meet with Wiza Nyasulu to discuss their differences. The trial court denied admission of the text since the State needed to prove Amanda's fear, not Smith's fear. Nyasulu then argued that the text message would impeach earlier argument by the prosecution and testimony regarding Smith's fear. The trial court reaffirmed its ruling on the belief that the prosecution had not mentioned during opening and Amanda had not testified to Smith's fear.

15

The prosecution called Amanda Nyasulu's son Jim, then sixteen-years-old, to testify. Defense counsel had interviewed Jim prior to trial. Jim informed the trial court that he had "a learning disability that . . . makes it hard for me to remember certain details." RP at 246. Jim testified that he had reviewed the recording of the phone call and that the recording accurately depicted the call on December 26. The State played the phone call for the jury.

Wiza Nyasulu testified on his own behalf. Defense counsel sought to introduce the video of Jane calling her father a "sociopath." According to Nyasulu, he could identify his wife's and daughter's voices on the video. The State again objected to introduction of the video. The trial court asked defense counsel as to the purpose of the video. Counsel responded that the video showed the bias of Amanda toward Nyasulu and impeached Amanda. Counsel did not argue that the video inflamed Nyasulu or caused him to threaten the life of Tyler Smith. The trial court deemed the video inadmissible as impeachment or substantive evidence and impermissible extrinsic evidence of a "prior bad act" of Amanda Nyasulu.

The defense called Tyler Smith to testify. Defense sought to introduce, through Smith, his January 4 text message to Amanda Nyasulu stating that Smith planned to visit Wiza Nyasulu to resolve differences. The trial court had denied admission of the text through Amanda. The trial court once again sustained an objection to the text message as irrelevant substantively and for impeachment purposes.

16

During closing, defense counsel argued that Wiza Nyasulu did not knowingly threaten Amanda Nyasulu because, during the call, Nyasulu was intoxicated and experiencing symptoms of posttraumatic stress disorder. The jury returned a guilty verdict.

LAW AND ANALYSIS

On appeal, Wiza Nyasulu contends the State presented insufficient evidence to convict him of felony harassment. He also assigns error to evidentiary rulings of the trial court and claims his trial counsel performed ineffectively.

Evidentiary Rulings

We address Wiza Nyasulu's evidentiary assignments of error first. Nyasulu assigns errors to four evidentiary rulings of the trial court: admitting the recording of the December 26 telephone call from Nyasulu to Amanda; admitting testimony concerning fear in Amanda Nyasulu and Tyler Smith that Nyasulu would fulfill the threat to Smith's life after December 27, 2019; excluding the January 4 text message that Tyler Smith sent to Amanda; and excluding the video wherein Amanda laughed when Jane called her father a sociopath. We hold the trial court did not abuse its discretion in issuing any of these rulings. Also, Nyasulu did not preserve some of the assignments.

*Issue 1: Did the trial court err in admitting as an exhibit the recorded phone conversation between Wiza and Amanda Nyasulu?*

*Answer 1: We decline to address this issue because Wiza Nyasulu did not object to the admission of the recording at trial.*

Wiza Nyasulu argues that the trial court erred in admitting the recording of the December 26 phone call between Wiza and Amanda Nyasulu because the State failed to lay a proper foundation. Nevertheless, at trial, Nyasulu's attorney expressly declined three times to object to the introduction of the phone call recording. This court may decline to review a claim of error asserted for the first time on appeal. RAP 2.5(a). Error may not be predicated upon a ruling admitting evidence unless it affects a substantial right of the complaining party and a timely objection or motion to strike was made. ER 103(a)(1). We decline to address this alleged error.

*Issue 2: Did the trial court err in admitting evidence that Amanda Nyasulu and Tyler Smith continued to fear for Smith's life after December 27?*

*Answer 2: We do not address this issue since Wiza Nyasulu did not object to the testimony at the time of trial.*

When assigning error to the admission of evidence of fear after December 27, Wiza Nyasulu identifies testimony from Tyler Smith that he continued to fear for his life at the time of trial and that Amanda testified that the couple installed security systems at three residences weeks after December 26. Nyasulu contends that evidence regarding future fear of harm was irrelevant to the prosecution. We have already noted that,

although Amanda testified to the installations of security systems, she did not identify the timing of the installations.

At trial, Wiza Nyasulu never contended that the State must limit its proof of Amanda Nyasulu's fear to the two days of December 26 and 27. More importantly, Nyasulu did not object to the evidence about which he now complains.

RAP 2.5(a) declares, in relevant part:

> The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court: (1) lack of trial court jurisdiction, (2) failure to establish facts upon which relief can be granted, and (3) manifest error affecting a constitutional right.

Error may not be predicated upon a ruling admitting evidence unless it affects a substantial right of the complaining party and a timely objection or motion to strike was made. ER 103(a)(1). Thus, we decline to address this assignment of error.

*Issue 3: Did the trial court err in excluding a text message from Tyler Smith to Amanda Nyasulu that he intended to discuss his concerns with Wiza Nyasulu?*

*Answer 3: No.*

Wiza Nyasulu next argues that the trial court erred by barring a January 4, 2020 text message from Tyler Smith to Amanda Nyasulu that would have demonstrated Smith's desire to go to Wiza Nyasulu's house in order to "talk things out." Opening Br. of Appellant at 21. During trial, the State objected to the introduction of the text message as irrelevant. The trial court agreed that the text message, sent nine days after the phone

call between Wiza and Amanda Nyasulu, lacked relevancy because the State needed to

show Amanda's reasonable fear, not Smith's fear. On appeal, Nyasulu contends the text

bore relevance to Amanda's fear.

To be admissible, evidence must be relevant. ER 402. We review a trial court's

evidentiary rulings for abuse of discretion. *State v. Clark*, 187 Wn.2d 641, 648, 389 P.3d

462 (2017). A trial court abuses its discretion when its decision is manifestly

unreasonable, its discretion is exercised on untenable grounds or for untenable reasons, or

if the court applied the wrong legal standard. *T.S. v. Boy Scouts of America*, 157 Wn.2d

416, 423-24, 138 P.3d 1053 (2006). We conclude the trial court did not abuse its

discretion for the reason given by the court. We discuss later the relevant law that the

State needed to show that Amanda Nyasulu reasonably feared for the safety of Tyler

Smith, not that Smith feared for his own life.

In addition to arguing that the text message bore relevance to his defense, Wiza

Nyasulu contends the trial court should have permitted his use of the message to impeach

witnesses. We disagree. Nyasulu has cited to no portion of the record, prior to the

attempt to admit the text, when a witness or the State referenced Smith's fear.

For the first time on appeal, Wiza Nyasulu argues that the State opened the door to

introduction of the text message by eliciting testimony from Jim regarding Jim's reaction

to the phone call. Jim, who was present during the phone call, testified that hearing the

threats gave him concern for Tyler Smith's safety. The open door doctrine "permits a

court to admit evidence on a topic that would normally be excluded for reasons of policy or undue prejudice when raised by the party who would ordinarily benefit from exclusion." *State v. Rushworth*, 12 Wn. App. 2d 466, 473, 458 P.3d 1192 (2020).

Jim testified after Amanda Nyasulu. We agree that Jim's fear for Tyler Smith's safety did not relate to Amanda Nyasulu's fear and that the State may have opened the door by questioning Jim. Nevertheless, defense counsel did not object to Jim's testimony. Nor did defense counsel thereafter contend that the State had "opened the door" for purposes of admitting the text messages. Therefore, we do not address this additional argument.

*Issue 4: Did the trial court err in excluding the video recording of a conversation between Amanda and Jane Nyasulu?*

*Answer 4: No.*

Wiza Nyasulu next argues that the trial court erred in excluding a video recording of Amanda laughing in response to their daughter referring to Nyasulu as a "sociopath." Nyasulu argues that the video holds relevance to the mens rea requirement of his substantive charge as it supports his argument that he was agitated after receiving the video from a third party. He also argues that the video should have been admitted for purposes of impeaching Amanda Nyasulu or refreshing her recollection.

We reject this assignment of error for numerous reasons. Wiza Nyasulu did not argue at trial that the video bore relevance to his mens rea. Amanda admitted to laughing

21

at Jane calling her father a name. Nyasulu failed to lay a foundation for admission of the video.

Wiza Nyasulu never argued, at trial, that the video bore relevance to his mens rea. We question its relevance anyway. The video shows as much a motive to threaten Amanda to kill her new beau as it shows a lack of knowing that he issued a threat.

When defense counsel sought to admit the video, the court questioned counsel as to whether the video was for substantive purposes. Defense counsel responded that Wiza Nyasulu intended to introduce the video only for impeachment purposes. Defense counsel never specified what testimony Amanda uttered that would be impeached by the video. Amanda admitted to laughing.

Defense counsel never properly authenticated the video under ER 901. No one testified that the video was what Wiza Nyasulu claimed it to be. Nor did defense counsel lay a foundation to refresh Amanda's recollection using the video. *See Columbia State Bank v. Invicta Law Group PLLC*, 199 Wn. App. 306, 328, 402 P.3d 330 (2017).

Sufficiency of Evidence

*Issue 5: Whether the State produced sufficient evidence for the jury to find beyond a reasonable doubt that Wiza Nyasulu knowingly threatened to kill Tyler Smith?*

*Answer 5: Yes.*

We move now to the substantive law concerning the crime of felony harassment and whether the State met its burden of proof. Wiza Nyasulu contends the State

22

presented insufficient evidence to convict him of felony harassment for three reasons.

First, the evidence did not support a finding that he knowingly threatened to kill Tyler

Smith. Second, the State did not prove he issued a true threat as is required under the

First Amendment to the United States Constitution. Third, the evidence did not support a

finding that Smith reasonably feared that Nyasulu would execute the threat.

When reviewing a challenge to the sufficiency of the evidence, this court

determines whether, after viewing the evidence in the light most favorable to the State,

any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). A claim of

insufficiency admits the truth of the State's evidence and all inferences that reasonably

can be drawn therefrom. *State v. Trey M.*, 186 Wn.2d 884, 905, 383 P.3d 474 (2016).

Circumstantial evidence and direct evidence carry equal weight when reviewed by an

appellate court. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). A

reviewing court defers to the fact finder on issues of conflicting testimony, witness

credibility, and persuasiveness of the evidence. *State v. Rodriguez*, 187 Wn. App. 922,

930, 352 P.3d 200 (2015).

RCW 9A.46.020 criminalizes harassment in Washington State. The statute

provides in pertinent part:

> (1) A person is guilty of harassment if:
> (a) Without lawful authority, the person *knowingly threatens*:

23

(i) To cause bodily injury *immediately or in the future to the person
threatened or to any other person*. . . .
. . . .
(b) The person by words or conduct places the person threatened in
*reasonable fear* that the threat will be carried out.
. . . .
(2)(b) A person who harasses another is guilty of a class C felony if
any of the following apply:
. . . .
(ii) the person harasses another person under subsection (1)(a)(i) of
this section *by threatening to kill the person threatened or any other
person*[.]

(Emphases added.)

A defendant knowingly threatens a victim under RCW 9A.46.020 when he subjectively knows that he is communicating a threat and knows that the communication directly or indirectly intentionally threatens to cause bodily injury to the person threatened or to another person. *State v. J.M.*, 144 Wn.2d 472, 482, 28 P.3d 720 (2001). The State is not required to prove that the speaker intended to execute the threat. *State v. Kilburn*, 151 Wn.2d 36, 48, 84 P.3d 1215 (2004).

RCW 9A.46.020 contemplates that the accused may threaten the alleged victim with harm to another, not to the victim. *State v. J.M.*, 144 Wn.2d 472, 488 (2001). Stated differently, the accused still commits the crime when he knowingly tells person A that he intends to harm person B. *State v. J.M.*, 144 Wn.2d at 488.

When arguing that the State presented insufficient evidence that he subjectively knew he was communicating a threat, Wiza Nyasulu emphasizes his state of mind and

underscores isolated comments by uttered by him during the telephone conversation, rather than reading conversation transcript as a whole. He contends that he initiated the call because of his love for Amanda and as a cry for help to see his children on Christmas. He argues that he only joked about killing Tyler Smith. He expressed emotion and hyperbole only as a reaction to Amanda expressing a desire to end the call. During trial, he described himself as in a drunken state, extremely sad and upset, in the middle of a mental breakdown, in an irrational state, and sleep deprived at the time of the December 26 call to Amanda.

Some of Wiza Nyasulu's factual assertions prove the State's case rather than assist Nyasulu. His expression of emotion and hyperbole only after Amanda threatened to end the call shows a motive to seriously threaten to kill Amanda's boyfriend. The jury could deem his characterization of his comments as a cry for help as confirming his subjective knowledge that he was engaging in a threat. Regardless, the State presented sufficient, if not overwhelming, evidence at trial to persuade a reasonable factfinder that Wiza Nyasulu knowingly threatened Amanda Nyasulu on communication of his intent to harm Tyler Smith.

The jury listened to a recording of the phone call, during which Wiza Nyasulu repeatedly declared that he would kill Smith or that Smith would otherwise die. Nyasulu threatened to execute a clever scheme whereby Smith's death would appear as a suicide. He boasted of his shooting prowess gained from his military experience.

Wiza Nyasulu highlights that, at times during the call, he stated he was joking. Nevertheless, he only stated once that he joked. Regardless of the number of times, a jury could reasonably reject his claim of joking, particularly because of the serious comments he made throughout the conversation including remarks uttered immediately after claiming he was only joking.

Defense counsel argued at trial that Wiza Nyasulu did not knowingly threaten Amanda Nyasulu because Wiza was intoxicated and experiencing symptoms of posttraumatic stress disorder. The jury could reasonably disregard this defense theory given the other evidence presented, including the recording of the phone call. A reviewing court defers to the fact finder on the persuasiveness of evidence presented at trial.

*Issue 6: Whether Wiza Nyasulu's speech constituted true threats?*

*Answer 6: Yes.*

Because RCW 9A.46.020 criminalizes pure speech, application of the statute must survive the strictures of the First Amendment. *State v. Williams*, 144 Wn.2d 197, 206-07, 26 P.3d 890 (2001). The First Amendment does not protect "true threats," statements designated as "made 'in a context or under such circumstances in wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of [another individual].'" *State v. Williams*, 144 Wn.2d 197, 207-08 (2014) (alterations in original) (quoting *State v.*

26

*Knowles*, 91 Wn. App. 367, 373, 957 P.2d 797 (1998)).  The threat must be a "real or serious threat" to survive constitutional scrutiny.  *State v. J.M.*, 144 Wn.2d 472, 482, 28 P.3d 720 (2001).  "Idle talk, joking, or puffery does not constitute a knowing communication of actual *intent* to cause bodily injury."  *State v. J.M.*, 144 Wn.2d at 482.

Washington courts conduct an objective First Amendment analysis in addition to the subjective mens rea requirement imparted by RCW 9A.46.020.  *See State v. Trey M.*, 186 Wn.2d 884, 893-95 (2016); *State v. Kilburn*, 151 Wn.2d 36, 48 (2004).  In order to avoid infringement on the right to free speech, this reviewing court performs a more demanding analysis as to whether the accused's utterance constitutes a true threat as opposed to the usual sufficiency challenge.  *State v. D.R.C.*, 13 Wn. App. 2d 818, 825, 467 P.3d 994 (2020).  This analysis considers the speaker's actual intended audience, not a reasonable audience or an unintended recipient.  *State v. D.R.C.*, 13 Wn. App. 2d 818, 826 (2020).

When arguing that his warnings about killing Tyler Smith did not entail true threats, Wiza Nyasulu emphasizes the same facts that he underscores when arguing that he lacked subjective knowledge of communicating a threat.  We provide the same answers to Nyasulu's contention, including the answers that the jury could discount his testimony that his existence was blurred on the night of December 26 and that he only joked about killing Smith.

27

A reasonable person in Wiza Nyasulu's position would have foreseen that Amanda would consider the threats against Tyler Smith as serious. A true threat differs from hyperbole when a speaker provides specific plans of causing harm and conveys the message with a serious demeanor. *State v. D.R.C.*, 13 Wn. App. 2d 818, 826 (2020). In the recorded phone call, Nyasulu spoke in a serious tone. He repeatedly uttered specific threats of a plan to kill Smith. For example, Wiza asked, "You do realize I could shoot from about a mile away with a 50 cal.?" RP at 263. Wiza also threatened, "If I don't have my kids today, he's dead tomorrow." RP at 265. Then, indicating he would frame Smith for suicide, Wiza pretended: "my name is Tyler Robert Smith, and I am feeling suicidal and I just put a .9 millimeter or a .22 caliber bullet . . . through my own fucking head." RP at 268. Wiza also said, "Hopefully, there's not a brush fire at [Smith's address]." RP at 270.

*Issue 7: Whether the State presented sufficient evidence for the jury to find beyond a reasonable doubt that Amanda Nyasulu reasonably believed Wiza Nyasulu would carry out a threat to kill Tyler Smith?*

*Answer 7: Yes.*

RCW 9A.46.020 requires the State to prove that the person threatened was placed in reasonable fear that the threat would be carried out. *State v. Mills*, 154 Wn.2d 1, 10-11, 109 P.3d 415 (2005). The trier of fact decides whether a person's fear is reasonable in light of the total context of the threats. *State v. Trey M.*, 186 Wn.2d 884, 906 (2016).

28

The State must prove the threat made and the threat feared are the same. *State v. C.G.*, 150 Wn.2d 604, 609-11, 80 P.3d 594 (2003). The trier of fact should not limit its interpretation of the threat to a literal translation of the words spoken. *State v. C.G.*, 150 Wn.2d 604, 609-11 (2003).

If the accused threatens harm to one other than the target of the coercion or intimidation, the State must prove that the target of coercion, here, Amanda Nyasulu, reasonably feared the threat. *State v. Morales*, 174 Wn. App. 370, 380, 298 P.3d 791 (2013). When the defendant is accused of communicating a threat to kill, the threatened person must have feared that the threat to *kill* would be carried out. *State v. C.G.*, 150 Wn.2d 604, 610 (2003). The State does not face a heavy burden in proving that the target of a threat was placed in reasonable fear. The target of a threat need only testify that he or she was "scared" that the threat would be carried out. *State v. Trey M.*, 186 Wn.2d 884, 905-06 (2016). But the State does not establish reasonable fear if it presents no evidence that the threatened person feared that the harasser would implement the specified threat. *State v. C.G.*, 150 Wn.2d 604, 610 (2003).

The jury heard sufficient evidence to conclude that Amanda Nyasulu reasonably feared that Wiza Nyasulu would execute his threat to kill Tyler Smith. When questioned by the State prosecutor at trial whether she feared that Smith might be in danger, Amanda responded, "Absolutely." RP at 186. She testified that she called Smith after Wiza's call

because she feared for his life. Smith and Amanda contacted law enforcement as a result of this fear.

Wiza Nyasulu argues that the State was required to prove that Amanda Nyasulu was certain that the threat would be carried out. We disagree. Nyasulu cites no law supporting this heightened standard of certainty. Case law only requires that Amanda be placed in reasonable fear of the threats.

Wiza Nyasulu further contends that the State needed to prove that Amanda Nyasulu's fear be specific to the dates of December 26 and 27, 2019, i.e. contemporaneous to the threats. Even assuming such to be true, Nyasulu commented, during the call, that Tyler Smith would die "tonight" or "tomorrow." RP at 265-67. Nevertheless, the State was not required to prove that Amanda's fear was specific to those dates. Again, Nyasulu cites no legal authority supporting this position.

Assistance of Counsel

*Issue 8: Whether trial defense counsel performed ineffectively when failing to challenge Jim's competency to testify?*

*Answer 8: No.*

A claim of ineffective assistance of counsel arises under both the U.S. Constitution and the Washington State Constitution. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. To demonstrate ineffective assistance of counsel, a defendant must make two showings: (1) defense counsel's representation fell below an objective standard of

30

reasonableness and (2) defense counsel's deficient representation prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Vazquez*, 198 Wn.2d 239, 247-48, 494 P.3d 424 (2021). The defendant has the burden to show that defense counsel's challenged conduct lacked legitimate strategic or tactical merit. *State v. Vazquez*, 198 Wn.2d 239, 248 (2021). Courts indulge a strong presumption that counsel is effective. *State v. Vazquez*, 198 Wn.2d 239, 247 (2021). If either prong of the test is not satisfied, no further inquiry is required. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

Defense counsel's failure to challenge sixteen-year-old Jim Nyasulu's competency to testify as a witness was not deficient. A classic example of trial tactics is when and how an attorney makes the decision to object during trial testimony. *State v. Vazquez*, 198 Wn.2d 239, 248 (2021). Defense counsel interviewed Jim before trial. As far as we know, counsel detected no disability in Jim that would preclude him from recalling the details of the December 26 phone call or be unable to testify truthfully. At trial, Jim disclosed before testifying that he had a learning disability making it difficult to remember certain details. Defense counsel could then have reasonably concluded that an attempt to challenge a young man's competency on the stand based on this remark would have elicited a negative reaction from the jury. And Jim did not thereafter struggle remembering any details during his testimony.

31

Even if the decision not to challenge Jim's testimony was deficient, the decision did not prejudice Wiza Nyasulu. Nyasulu argues that defense counsel should have raised the objection regardless of its chance at success because Jim laid the foundation for admission of the recorded phone call. Nevertheless, Amanda could have also laid the foundation for admission of the phone call. Thus even if a challenge to Jim's competency had been successful, the State still would have otherwise introduced the recording.

Cumulative Error

*Issue 9: Whether cumulative error requires reversal of Wiza Nyasulu's conviction?*

*Answer 9: No.*

In a final assignment of error, Wiza Nyasulu argues that cumulative error warrants reversal, even if no individual error requires reversal. Although some errors, standing alone, may not be of sufficient gravity to constitute grounds for a new trial, the combined effect of the accumulation of errors may require a new trial. *State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984). Because we discern no trial errors, the cumulative error doctrine does not apply.

CONCLUSION

We affirm Wiza Nyasulu's conviction for felony harassment.

32

No. 37708-3-III
*State v. Nyasulu*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Staab, J.

33